## CUMMINGS INCORPORATED

v.

### Terry J. DORGAN, Jr.

Court of Appeals of Tennessee, Western Section, at Nashville.

Dec. 3, 2008 Session.

Sept. 23, 2009.

Order Denying Petition to Rehear Dec. 9, 2009.

Permission to Appeal Denied by Supreme Court June 17, 2010.

---

**12.** The standard of review for a declaratory judgment action. *McCallen,* 786 S.W.2d at 641.

Andrew S. Naylor and Michael Rusie, Nashville, Tennessee, for the appellant, Cummings Incorporated.

Mark A. Baugh and Nancy A. Vincent, Nashville, Tennessee, for the appellee, Terry J. Dorgan, Jr.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

This appeal involves an employment agreement and a non-compete covenant. The defendant sales representative was employed as a salesperson by the employer sign company. The parties executed an agreement setting out the structure of the employee's compensation, to be effective for three years. Prior to the expiration of the agreement, the plaintiff employer asked the employee to sign a new contract, changing his pay from straight commissions to salary plus commissions, as well as a separate two-year non-compete contract. The employee initially declined to sign the new contracts, but ultimately did so because he was told that he would be terminated if he refused. Over a year later, the employee quit to work for one of the plaintiff's competitors, and began soliciting his previous employer's largest account. The employer filed this lawsuit to enforce the non-compete contract. The employee asserted that the non-compete contract was unenforceable and filed a counterclaim, alleging breach of contract. After a bench trial, the trial court enforced the non-compete contract, but held that the new compensation contract, executed on threat of termination, was void because it was signed under duress. The trial court awarded the employee damages. The employer now appeals, arguing that the new compensation contract was not signed under duress. The employee argues on appeal that the non-compete contract is unenforceable, because it was not supported by consideration and was also signed under duress. We find that the defendant employee was an employee-at-will of the plaintiff company. On this basis, we reverse the trial court's finding that the new compensation contract was signed under duress, because threatening an at-will employee with termination does not constitute duress under the circumstances. We affirm the trial court's holding that the non-compete contract was enforceable.

### FACTUAL BACKGROUND

Plaintiff/Appellant Cummings Incorporated ("Cummings"),[1] based in Nashville,

---

1. In its appellate brief, Cummings Incorporated refers to itself as Cummings Signs, Inc. In

Tennessee, designs, engineers, manufactures, sells, and installs signage products for businesses in retail, fast food, and hospitality industries throughout the United States.[2] Cummings also remodels existing signage through the Cummings Remodel Group ("CRG"); these remodel projects are referred to by the parties as either "CRGs" or "CSRs." Defendant/Appellee Terry J. Dorgan, Jr. ("Dorgan"), was employed by Cummings as a salesperson from January 1987 through January 2006.[3] Dorgan was a "remote" salesperson for Cummings; he worked from his home in Columbus, Ohio.

On October 9, 1998, Dorgan executed a document related to his terms of employment with Cummings; the document was entitled "National Sales Group Commission Sales and Compensation Program January 1, 1999 thru December 31, 1999." It is referred to herein as the "Original Contract."[4] A threshold issue in this case involves whether this Original Contract is an employment contract or simply a compensation agreement. Therefore, we will outline the provisions pertinent to this issue.

The first paragraph of the Original Contract states: "This program is not an Agreement to employ [Dorgan] for any specified length of time." After outlining in great detail Dorgan's commission structure, paragraph seven of the Original Contract provides that Cummings "may terminate this Agreement at any time, and without advance notice, *for cause.*" Thus,

while the first paragraph of the Original Contract states that it is not an agreement to employ Dorgan for any specified length of time, the seventh paragraph provides only for termination of "this Agreement" for cause. The Original Contract states that Dorgan was permitted to terminate it upon thirty days written notice to Cummings. If Dorgan terminated "this Agreement," he would be bound by a non-compete clause in which he agreed "to not solicit or compete with the company on any accounts prospected or sold for the company as documented in the call reports . . . for one year from the date of termination."

Dorgan's compensation as set forth in the Original Contract was based totally on commissions: 2% of sales on new business (less than two years old), 1% on old business (between two and five years old), and .5% on institutional business (older than five years). Paragraph four of the original contract provided for adjustments in commission percentages based on sales that generated an unusually high or low profit margin. If a particular sale had an extremely low profit margin, it was considered a "second tier" account. On such accounts, Dorgan earned only half of the normal commission rate:

Sales commission on accounts identified during the bidding process, as Second Tier (extremely low margin) business will be paid at one-half the normal commission rate. Second Tier accounts are

---

the pleadings filed in the trial court, the company is called Cummings Incorporated. We assume for purposes of this appeal that these are alternative names for the same entity.

2. Cummings is an $80 million business with 400 to 500 employees.

3. Dorgan had one break in employment between 1991 and 1992, the circumstances of which are not relevant to this appeal.

4. Prior to this agreement, Dorgan earned a salary from his employment at Cummings, and his compensation was not based on commissions. His previous agreements with Cummings are not in the record and are not relevant to this appeal.

usually identified by high volume, low service requirements; business on which the company is not normally competitive, but which we aggressively quote to help reduce overall plant burden.

The Original Contract does not define the term "extremely low margin." If a particular sale had a very high profit margin (27.5% or higher), the Original Contract provided for additional commission. Paragraph six of the Original Contract stated: "It is understood that the company retains the option to realign territories and/or customers during the calendar year."

On approximately March 14, 2003, the parties executed a document that revised some of the commission percentages in the Original Contract, but otherwise incorporated all of its remaining terms. This second document, referred to herein as the "Revised Contract," was to remain in effect from March 1, 2003, through December 31, 2005.

Prior to the execution of the Revised Contract, Dorgan's immediate supervisor was Cummings' Executive Vice President and Chief Marketing Officer, James Murray ("Murray"). After the execution of the Revised Contract, Dorgan was told to report to the general manager of Cummings' western division, Doug Malo ("Malo"). Malo lived in southern California and reported directly to Dorgan's previous immediate supervisor, Murray.

In the earlier years of his employment, Dorgan's primary accounts were Kentucky Fried Chicken ("KFC") franchisees, operated by Tricon Global Restaurants, Inc. ("Tricon"). Tricon also managed Pizza Hut and Taco Bell. In May 2002, Tricon changed its name to YUM! Brands, Inc. ("YUM"). YUM began to operate other businesses, including Long John Silver's restaurants and A&W Root Beer. YUM was one of Cummings' largest clients, and Dorgan was Cummings' representative assigned to YUM.

In October 2003, for the first time, YUM conducted a "reverse auction" for signage vendors to compete for YUM's signage business. In the reverse auction, conducted over the internet, signage vendors engaged in essentially a bidding war to become an approved vendor for YUM. YUM set the initial ceiling price for certain products, and the competing vendors submitted bids that were lower than YUM's ceiling price, with the lowest bids winning the right to be a YUM vendor.

Cummings participated in YUM's reverse auction, lowering its price substantially to compete for YUM's business. It succeeded, as it was selected as an approved vendor for YUM, along with Zimmerman Sign Company (later acquired by Federal Heath Sign Company) and Everbrite. Although the profit margin on Cummings' YUM business was reduced by the lowered price, the volume of YUM business directed to Cummings greatly increased after the reverse auction. Initially after the reverse auction, Dorgan continued to have primary responsibility for the YUM account.

At the time the YUM reverse auction was concluded, Dorgan's Revised Contract was still in effect and was scheduled to remain effective through December 2005. However, in light of the reduced profit margin for YUM business, Cummings decided to change Dorgan's compensation. Consequently, in July 2004, Malo presented two new agreements to Dorgan, referred to herein as the 2004 Contract and the 2004 Non–Compete Agreement. The differences between the terms of the Revised Contract and those in the 2004 Contract were significant.[5]

5. Dorgan's job description was changed from "Sales Executive" in the Revised Contract to

Under the Original and Revised Contracts, Dorgan's compensation had been 100% commission. Under the proposed 2004 contract, Dorgan would be guaranteed a salary of about $70,000 per year in addition to commissions, albeit at smaller percentages. The 2004 Contract provided that Dorgan would earn a .25% commission on "all YUM sales collected," a .50% commission on CSR products that were sold and collected, and a 2% commission on all new business unrelated to YUM. The 2004 Contract also required Dorgan to sell CRG or CSR remodel contracts for Cummings, thirty in 2004 and sixty each year thereafter.

As in the Original and Revised Contracts, the 2004 Contract provided that Cummings could terminate Dorgan "at any time for cause without advance notice." However, it contained an additional provision stating that Dorgan could be terminated "with 30 days advance notice without cause." Furthermore, while the Original and Revised Contracts had a one-year non-compete covenant in the event that Dorgan terminated his employment, the 2004 Contract extended the covenant to two years. In addition, the 2004 Contract required Dorgan to execute the separate 2004 Non–Compete Agreement. The separate 2004 Non–Compete Agreement, in relevant part, largely reiterates the non-compete provision contained in the 2004 Contract and also makes it applicable in the event Dorgan's employment were terminated by Cummings.

When Malo presented Dorgan with the 2004 Contract and the 2004 Non–Compete Agreement, Dorgan resisted signing them. He told Malo that he did not want to execute them because he preferred the terms of the Revised Contract, which was effective through December 2005. Malo encouraged Dorgan to sign them, telling

Dorgan that the new contract terms were a good arrangement for him. Dorgan disagreed, and continued to refuse to sign. Malo then indicated to Dorgan that his job may be in jeopardy if he did not sign the new contracts. In light of this, on August 4, 2004, Dorgan reluctantly executed the 2004 Contract and the 2004 Non–Compete Agreement.

Five months later, on January 2, 2005, a meeting was held at Cummings' corporate office in Nashville regarding the management of the YUM account. Present at the meeting were Dorgan, Malo, Steve Kerr (Cummings' President and CEO), Randy Kerr (Steve Kerr's son), and Everett Evans. Dorgan was told that representatives at YUM had informed Cummings that YUM wanted to begin communicating with Cummings only through its Nashville headquarters. In view of this change, Dorgan was encouraged to move to Nashville; Dorgan declined and chose to remain in Ohio. Dorgan was then informed that he would no longer be assigned to handle the YUM corporate account; instead, he would be restricted to selling CRGs. Dorgan was also informed that, while his salary would remain the same through June 30, 2005, after that date his YUM commissions under the 2004 Contract would cease.

On June 2, 2005, Cummings terminated Dorgan's supervisor, Malo, for cause. After Malo left Cummings, he warned Dorgan to "watch his back"; Dorgan took Malo's comments to mean that he might be terminated next. Cummings did not appoint a replacement supervisor for Dorgan. Around this time, as promised, Cummings stopped paying Dorgan commissions on YUM corporate sales.

On January 23, 2006, Dorgan tendered his immediate resignation from Cummings.

"Distributor Relations" in the 2004 Contract.

At the time Dorgan resigned, he had accumulated 160 hours of vacation time in 2005 that he did not use by the end of the year. Cummings refused to pay him for the total amount of unused vacation for 2005; Dorgan was paid for only twelve hours (one and a half days) of vacation, pursuant to Cummings's new "use it or lose it" vacation policy that went into effect on January 1, 2006.

On February 1, 2006, Dorgan began working at Federal Heath Sign Company ("Federal Heath"). At the time Dorgan joined Federal Heath, it had just acquired Zimmerman Sign Company ("Zimmerman"), another approved YUM sign vendor.[6] In acquiring Zimmerman, Federal Heath also acquired the YUM account, and Federal Heath hired Dorgan to help it expand the YUM account. In his new position with Federal Heath, Dorgan earned a $73,000 annual salary and had an opportunity to earn commissions as well.

On his first day at Federal Heath, Dorgan attended a trade show in Las Vegas, Nevada ("the Trade Show"), for Taco Bell, a YUM business. Dorgan's presence at the trade show was soon noticed by Cummings' representatives. Shortly after Dorgan arrived at the Trade Show, Randy Kerr presented Dorgan a letter, drafted by counsel for Cummings, asserting that Dorgan's participation in the Trade Show on behalf of Federal Heath constituted a violation of both the 2004 Contract and the 2004 Non–Compete Agreement. After receiving the letter, Dorgan left the Trade Show and discontinued his solicitation of YUM accounts. Federal Heath officially removed Dorgan from working on the YUM account. Cummings claims that, despite being officially removed from Federal Heath's YUM account, Dorgan continued behind the scenes to help Federal Heath generate more sales to YUM, and

that this violated his non-compete agreement.

## PROCEEDINGS BELOW

On March 8, 2006, Cummings filed the instant lawsuit against Dorgan, alleging that he had breached the 2004 Contract and the 2004 Non–Compete Agreement by soliciting business from YUM within the two-year period after leaving his employment with Cummings. Cummings sought damages, injunctive relief, a declaratory judgment, and specific performance based on Dorgan's alleged breach of contract. On April 4, 2006, the trial court issued a preliminary injunction, ordering Dorgan to refrain from soliciting business from Yum or its affiliates until further order of the court.

On April 9, 2006, Dorgan filed an answer and a counterclaim against Cummings, alleging breach of contract, tortious interference with business relationship, and violation of Tennessee Code Annotated § 50–2–103(a)(3) for Cummings' failure to pay for his accrued vacation from 2005. Dorgan asserted that the 2004 Contract and 2004 Non–Compete Agreement were both void because he executed them under duress, that Cummings breached the Revised Contract that remained in effect, and that the two-year noncompete provisions contained in the 2004 Contract and 2004 Non–Compete Agreement failed for lack of consideration and/or were not enforceable because Cummings had no legitimate business interest to protect. Further, he claimed that the enforcement of the two-year noncompete provisions constituted tortious interference with Dorgan's business relationships.

Beginning on January 17, 2007, a three-day bench trial was conducted. At the outset of the trial, Cummings Executive

---

6. Federal Heath is also a large company, employing almost 600 people.

Vice President, James Murray, testified about Dorgan's employment at Cummings and the circumstances surrounding the execution of the 2004 contracts at issue. Murray said that Dorgan's job duties included making product offerings, maintaining the price book,[7] working out final quotes for proposals, making bids for business, managing customer feedback, and otherwise serving Cummings' clients. Dorgan also participated in marketing events for Cummings, traveling to trade shows, playing in golf tournaments, and generally making "sure the franchise community stayed aware of Cummings and what was new going on at Cummings, what [they] were selling, . . . trying to make sure that folks knew that Cummings was changing. . . ." Although Dorgan was free to sell to other businesses, Cummings' YUM account became all-consuming, precluding Dorgan from focusing on new sales.

Murray drafted Dorgan's Original Contract, which he characterized as a pay structure for Cummings' sales executives rather than an employment agreement. Dorgan's Revised Contract, Murray said, was negotiated between Cummings and Dorgan after everyone realized that the YUM account was requiring most of Dorgan's time. The Revised Contract set out commission rates that were intended to stabilize Dorgan's earnings with a focus on YUM entities. Murray testified that, under the Original and Revised Contracts, Dorgan's average income was between $85,000 to $95,000 per year.

After YUM held its "reverse auction," Cummings' volume of YUM business increased, but at the same time the profit margin on YUM sales fell from an average of 25% to between 16% and 18%, making YUM a "second tier" or "extremely low-margin account" under the Revised Con-

tract. Although second tier accounts were considered by Cummings to be "low service," Murray conceded that the YUM account required "more than traditional project support." Nevertheless, because YUM was considered a second tier account, Murray explained, Dorgan's commission on YUM sales would have been cut in half pursuant to Paragraph 4 of the Original and Revised Contracts.

At the time the 2004 Contract was drafted, Murray communicated with Dorgan's boss, Malo, and did not discuss the contract directly with Dorgan. Murray decided not to apply second-tier percentages to Dorgan's commission until another compensation arrangement could be worked out. Thus, Cummings paid Dorgan the YUM commissions according to the percentages in the Revised Contract while Dorgan's new compensation arrangement was under discussion:

> [T]here was various dialog back and forth between Mr. Malo and myself, which ultimately settled on—and I didn't agree on what salaries were and whatnot. What I said was, try to get him to not go backwards, just to keep his level close to where it is, and give him an upside to that from a commission standpoint, and give him some other things that will help him earn some more money, because the corporate work that got assigned to us and where we are isn't going to provide that opportunity.

> So Doug began whatever his negotiation was. This was to be done initially, this contract was to be in place by April of [2004].

Murray intended for Dorgan's new contracts to be signed in April, because that was when YUM's new pricing was expected to go into effect. He admitted having

---

7. The "price book" contained Cummings' various products and its published pricing.

to "step[ ] on Doug's head" to get the contracts signed by Dorgan. Dorgan did not execute the new contracts until August 2004, so Dorgan actually earned several months of full commissions based on the increased volume of YUM business that he would not have received had the 2004 Contract been signed sooner.

Murray denied telling either Dorgan or Malo that Dorgan would be fired if he did not sign the new contracts. He claimed that he intended for the new contracts "to give [Dorgan] opportunity, but not put [Dorgan] in any kind of harm's way or tear his income up too bad." Murray explained that Dorgan was required to sign the 2004 Non–Compete Agreement as a separate document simply because all employees were asked to sign one if they had a level status change, such as Dorgan's compensation changing from straight commissions to a salary. The non-compete period was changed to two years because of the length of Cummings' contract with YUM and because it was the company standard. Murray characterized it as "employee housekeeping." [8]

Shortly after Malo was terminated in June 2005, Murray stated, Dorgan began to complain that he was unable to sell CRGs because he was not being supported at the level he needed. By comparison, another Cummings employee who sold CRGs in the western half of the United States, Scott Angotti, sold forty CRGs in the same time period in which Dorgan sold only one. Murray said that Dorgan repeated to him Malo's warning that Dorgan "was next on the Hit Parade and that he— you know, he needed to ... watch his back." Murray responded to Dorgan by

dismissing the comment as untrue and as "sour grapes by an ex-employee."

The day Dorgan resigned, Murray called Dorgan and unsuccessfully attempted to persuade Dorgan to reconsider his resignation. In the conversation, Murray told Dorgan that Cummings fully intended to hold him to the two-year noncompete agreement and prevent him from soliciting YUM on behalf of his next employer for that period of time. When Dorgan responded somewhat vaguely, Murray told Dorgan emphatically that he was not to "call on YUM for two years, period. The end."

About a week later, Randy Kerr called Murray to tell him that Dorgan was at the Taco Bell Trade Show in Nevada on behalf of his new employer, Federal Heath. Murray immediately called Federal Heath's Human Resources Director and told her that Dorgan had a non-compete agreement and that he expected Dorgan to abide by it. Murray testified that she told him that she was unaware of Dorgan's non-compete agreement. Within a few hours, Dorgan left the Trade Show.

Parts of Doug Malo's deposition testimony were read into evidence at trial. Malo drafted Dorgan's 2004 Contract. He was instructed by Steve Kerr and James Murray to get Dorgan to sign it. When Malo presented the 2004 Contract to Dorgan, he was unwilling to sign it. As time went by without Dorgan's signature on the contract, Steve Kerr and Murray began to pressure Malo about getting it signed. Malo said that he "was under the distinct impression that if [Dorgan] was not going to sign that document that he was going to be terminated." Malo denied telling Dorgan that his job was in jeopardy, explain-

---

**8.** Murray's testimony on Dorgan's 2004 Contract and the 2004 Non–Compete Agreement was generally corroborated by Cummings' President and CEO Steve Kerr. Like Murray,

Kerr maintained that Dorgan's Original and Revised Contracts were compensation agreements, not employment agreements.

ing that he did not do so because he did not want Dorgan to be under that kind of pressure. When Dorgan told Malo that he did not need or want a new contract, Malo tried to persuade him: "I was trying to sell him that this was going to be good for him. And if I did not think that it was a fair document I wouldn't have presented it to him. But I told him that he needed to sign this because the business had changed. . . ."

Cummings' Human Resources Director, Linda Fletcher ("Fletcher"), testified about the change in Cummings' vacation policy and her conversation with Dorgan regarding that policy. Dorgan called her on January 23, 2006, before he resigned from Cummings. In the conversation, Dorgan asked Fletcher whether he would be paid for accrued vacation if he were to quit working at Cummings. Fletcher referred Dorgan to Cummings' new vacation policy, which was included in the employee handbook that became effective two weeks earlier, on January 1, 2006. Under the revised policy, vacation time is given by Cummings annually on a "use it or lose it" basis, i.e., if the employee does not use his vacation time by the end of the calendar year, he would "not be permitted to 'carry' or 'accrue' vacation time not used into the following year." The revised policy explains that vacation benefits are provided "based on the expectation of continued future employment, therefore, employees whose employment ends with Cummings, Inc. will NOT be paid for vacation Accumulated But Not Taken except for employees retiring or employees being laid-off." Fletcher told Dorgan that, under this policy, if he quit working on that day, he would not be paid for any unused vacation time.

Parts of the deposition of Mark Symcox ("Symcox"), National Sales Manager for Federal Heath, were read into evidence.

Symcox said that Federal Heath had not done business with YUM prior to October 2005, when it acquired Zimmerman Sign Company. He confirmed that Federal Heath sought to hire Dorgan to help expand the YUM account based on his previous contacts with YUM, and also to generally expand Federal Heath's accounts in the northeast United States. With the help of Dorgan, Federal Heath wanted to increase its YUM sales to $5 million. An Employment Requisition form was entered into evidence, which highlighted Dorgan's value to Federal Heath because of his extensive knowledge of YUM and "all the key contacts at YUM."

When Dorgan was hired, Symcox was aware that Dorgan had a noncompete agreement related to the YUM account. However, Dorgan told Symcox that his attorney had advised him that the non-compete was probably unenforceable. Federal Heath decided to hire Dorgan, despite the non-compete, based on the likelihood that it was not enforceable. Symcox said that Dorgan was valuable to Federal Heath even if non-compete were enforced. Had Dorgan been able to work on the YUM accounts in 2006, Symcox testified, he could have earned about $30,000 to $40,000 in commissions on that account.

Dorgan testified on his own behalf. Dorgan acknowledged his understanding that, under all of the contracts at issue—the Original Contract, the Revised Contract, and the 2004 Contract—Cummings could have fired him at any time for any reason, and also that Cummings was free to realign its clients as it deemed appropriate. Despite Dorgan's acknowledgement that none of the contracts guaranteed him employment, he expected Cummings to abide by the Revised Contract for the entire three-year duration of the agreement while he was employed at Cummings. Dorgan stated that he specifically

negotiated the three-year term in the Revised Contract "so that we don't have to go through this again in 10 months, and then again 12 months later, and 12 months after that. . . ." Before Dorgan signed the Revised Contract in 2003, he was aware that YUM planned to conduct a reverse auction for its future business, and he suspected that Cummings would emerge as an approved vendor. In light of this, he signed the Revised Contract because it had a three-year duration; this duration made him feel secure that his commission payments would increase from the additional YUM business he expected to get. As Dorgan anticipated, Cummings' YUM business increased after the reverse auction. However, instead of Dorgan's income increasing commensurately under the terms of the Revised Contract, this arrangement ended prematurely and he was forced to sign the 2004 Contract.

Dorgan said that the terms of the 2004 Contract were not negotiated with Malo or anyone else at Cummings; it was simply presented to him. Dorgan initially refused to sign the 2004 Contract because he already had a satisfactory three-year contract in place, and he preferred earning straight commission rather than having a salary. He maintained that Malo never mentioned to him that the YUM account had become a second-tier account or that this was the reason Cummings had proffered the 2004 Contract. Dorgan said that Malo pressured him into signing the 2004 Contract, telling him that its terms were "good and fair," and that Steve Kerr and Murray wanted the contract signed. He testified:

Q: Why did you sign [the 2004 Contract]?

A. I signed it because my boss [Malo] told me that unless I had another job to go to, I'd better sign the agreement. And he also reinforced that by telling me that, "Terry, you have to realize that you are the last of the remote salespeople at Cummings, and [Steve] Kerr doesn't appreciate having remote salespeople such as yourself, and you're aware of that."

I didn't have a choice at that point. I felt like I had to sign it and get it in.

Dorgan felt that Malo had given him no choice; "[i]t was a sign it, get it in here, or go find a new job." When asked if he had been told he would be fired if he did not sign the document, Dorgan replied, "No, [Malo] did not use those words."

Dorgan submitted documents listing his income for each month in 2004 and 2005. For the first half of 2004, while the Revised Contract was still in effect, Dorgan's commissions increased because Cummings continued to pay him according to the rates in the Revised Contract.[9] Once the 2004 Contract was signed in August 2004, however, Dorgan's income became based on the salary set out in that contract and reduced commission percentages. In 2004, Dorgan earned the following amounts:

| | |
|---|---|
| January | $ 7,416.29 |
| February | 6,385.00 |
| March | 6,686.40 |
| April | 7,978.21 |
| May | 12,431.57 |
| June | 12,114.99 |
| July | 20,855.42 |
| August | 7,593.96 |
| September | 8,803.06 |
| October | 7,963.42 |
| November | 8,111.44 |
| December | 10,735.10 |
| 2004 TOTAL | $117,074.86 |

9. Dorgan disagreed with Murray's assertion that the YUM account had become a second tier account under the Revised Contract. From his own experience, he stated, an extremely low margin account is one earning between 4% and 10% profit margin. Also, the YUM account was not a low service account. Therefore, he contended, he was at all times entitled to the full commission under the Revised Contract.

Dorgan also testified about the meeting in January 2005. In the meeting, Dorgan was told that "things were changing on the YUM account again." At that point, Dorgan said, "Randy Kerr became the relationship manager for all of YUM," and Everett Evans became the new vice president of the YUM account. Dorgan was no longer Cummings' corporate representative to YUM; rather, he was relegated to selling only CRG remodel business. Dorgan was surprised when he was told in the meeting that his commissions would stop in mid–2005, because the 2004 Contract stated that it could "not be changed without the express written consent of Cumming's [sic] and Employee. . . ." Dorgan also testified that he was never informed about how he would be paid for CRG sales.

For the first six months of 2005, Dorgan's income reflected his removal from the corporate YUM account and his reassignment to CRG sales. In the last few months of 2005, Dorgan was paid only his salary and no commissions.[10] Dorgan's earnings for 2005 were as follows:

| | |
|---|---|
| January | 9,966.30 |
| February | 6,521.63 |
| March | 6,574.16 |
| April | 8,931.14 |
| May | 6,560.33 |
| June | 6,883.00 |
| July | 6,730.00 |
| August | 5,384.00 |
| September | 5,384.00 |
| October | 5,384.00 |
| November | 5,384.00 |
| December | 5,384.00 |
| | |
| TOTAL | 79,086.56 [11] |

Dorgan testified about his recollection of his conversation with Linda Fletcher on the morning he resigned. She encouraged him to go to the Cummings website to view the new vacation policy, but he could not find it. Dorgan claimed that he never received a copy of the new vacation policy. Dorgan said that, by the time he resigned, he had accumulated 160 hours of accrued and unused vacation time. Because Dorgan's pay stub showed that he had 160 days of vacation available, he believed that he should have been paid for this accrued but unused vacation when he resigned.

Dorgan testified that, before he decided to leave Cummings to work for Federal Heath, he obtained an opinion from his attorney that his noncompete agreements were not enforceable. Dorgan felt his breach of his noncompete agreement was justified because Cummings had first breached the 2004 Contract by refusing to pay him commissions, among other things. Dorgan stated that, after he left the Taco Bell Trade Show in February 2006, he had no further contacts with anyone at YUM, and he received no commissions on the YUM account at Federal Heath. At Federal Heath, Dorgan received a base salary of $73,000 per year. Had he been paid commissions on the YUM account at Federal Heath in 2006, he would have made an additional $77,000.

At the conclusion of the trial, the trial court took the matter under advisement. On October 17, 2007, the trial court entered a memorandum opinion holding that

---

**10.** It is unclear whether Dorgan would have been entitled to a commission for his CRG sales. He was unsuccessful in selling CRGs, and he sold only one such job in 2005. Dorgan explained that he was basically on his own, designing and selling CRGs for the entire eastern half of the United States, when the product was being produced in California. He claimed that he did not have the necessary support from Cummings personnel to succeed at selling remodel jobs in the eastern part of the country.

**11.** According to Exhibit 13, Dorgan's total earnings for 2005 were $80,432.56. The total amount of monthly earnings listed in that Exhibit, however, add up to $79,086.56. We assume the total on the exhibit was a mathematical error.

the 2004 Contract was void. Resolving certain factual disputes in favor of Dorgan, the trial court found:

In a meeting with Mr. Malo where the 2004 Contract was presented to him, Defendant initially refused to sign but signed at the behest of Mr. Malo who believed that Defendant was going to be terminated if he did not sign. Defendant was reluctant to sign the 2004 Contract because of his existing three-year contract and the fact that, under the 2004 Contract, he moved from commission-based income to a weekly salary plus commission. Defendant asserts that he was told by Mr. Malo to either sign the 2004 Contract or lose his employment.

Given all the circumstances, the Court is of the opinion that Defendant's action in signing the 2004 Contract was not voluntary and the circumstances constituted duress.... The record is clear that Defendant did not want to sign the 2004 Contract; that he considered the compensation provision to be less favorable than in the Revised Contract; that the impetus for developing and presenting the 2004 Contract to Defendant was to accommodate changes brought about by Plaintiff's successful pursuit of the Yum! account; and the record does not show any negotiations with Defendant relative to the terms of the 2004 Contract. Had Defendant not signed the 2004 Contract, Plaintiff would have been left in the position of either having to unilaterally terminate the Revised Contract, thereby incurring liability to Defendant, or continuing Defendant's employment under the terms of the Revised Contract. Plaintiff breached the Revised Contract by unilaterally terminating it prior to its expiration and is liable to Defendant for compensation Defendant would have received (less what he did receive).

(Citations omitted.) Thus, the trial court found that Dorgan signed the 2004 Contract only because he was told that he would be terminated if he refused, and that this constituted duress. On this basis, the trial court held that the 2004 Contract was void.

Despite holding that the 2004 Contract was executed under duress, the trial court nevertheless found that the 2004 Non–Compete Agreement was enforceable:

In the course of Defendant's employment with Plaintiff, he had access to pricing and other internal financing information as well as engineering drawings and the other information that Plaintiff used in servicing its clients. He had worked with the francisees and Yum!, Inc., corporate personnel throughout his employment and, by virtue of his responsibilities, was the "face" of Plaintiff with reference to Yum!, Inc., and the franchisees. His knowledge of Plaintiff's capabilities to service the account, the needs of Yum! and its franchisees, as well as personnel affiliated with the company and franchisees, were unique and valuable to Plaintiff and properly protectable by such a covenant. Perhaps no greater testament to Defendant's importance to Plaintiff was the fact that he was engaged by Federal Heath for the specific purpose of facilitating Federal Heath's pursuit of the Yum!, Inc., business. *See* Trial Exhibits 8–10. Plaintiff is entitled to enforcement of the Non–Compete Agreement....

In light of its finding that the 2004 Non–Compete Agreement was enforceable, the trial court rejected Dorgan's claim that the 2004 Non–Compete Agreement constituted interference with Dorgan's business relations.

The trial court denied Dorgan's Section 50–2–103(a)(3) claim for accrued vacation

pay. It based this decision on the language in Cummings' vacation policy included in the employee handbook, which provides that only employees who retire or are laid off are entitled to be paid for accumulated vacation.

Thus, the trial court concluded that the Revised Contract remained in effect, and that Cummings breached the Revised Contract by terminating it prior to the December 31, 2005 expiration date. The trial court scheduled a hearing on damages for a later date.

On February 1, 2008, the trial court held a hearing on damages. On February 11, 2008, the trial court entered its final order, finding that Dorgan was entitled to damages of $70,554.70, plus $14,110.94 in interest, which constituted the commissions due Dorgan under the Revised Contract, minus the amount Dorgan was paid by Cummings. From this order, Cummings now appeals.

### ISSUES AND STANDARD OF REVIEW

Cummings raises three issues for our review:

1. Whether the evidence at trial preponderates against the trial court's finding that Dorgan signed the 2004 Contract under duress?

2. Whether the evidence at trial shows that Dorgan ratified the 2004 Contract when he worked and was paid pursuant to its terms for 17 months and he did not raise the issue of "duress" until 22 months later, well after he quit his job at Cummings?

3. Whether the trial court erred in calculating Dorgan's damages under the Revised Contract, ignoring its clear and unambiguous language?

Appellee Dorgan raises the following additional issues in this appeal:

1. Whether the trial court erred in enforcing the 2004 Non–Compete Agreement, when it was signed under duress at the same time as the 2004 Contract?

2. Whether the trial court erred in holding the 2004 Non–Compete Agreement was supported by adequate consideration?

3. Whether the trial court erred in determining that Dorgan is not entitled to recover his unused vacation pay from 2005?

We review the trial court's findings of fact *de novo*, presuming those findings to be correct, unless the evidence preponderates otherwise. *Hardy v. Harris*, No. 01–A–01–9001–CH–00005, 1990 WL 61429, at *1 (Tenn.Ct.App. May 11, 1990). Factual findings that are based on witness credibility are given great weight on appeal, and such factual findings will not be reevaluated absent clear and convincing evidence to the contrary. *Sullivan v. Sullivan*, 107 S.W.3d 507, 509–10 (Tenn. Ct.App.2002). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *Id.* at 510.

### ANALYSIS

We first address the trial court's finding that Dorgan executed the 2004 Contract under duress. After resolving the duress issue, we will address the remaining issues raised on appeal.

#### Duress

The trial court in this case found that Dorgan executed the 2004 Contract under duress, because he was told by his Cummings supervisor, in effect, that if he refused to sign it, his employment would be terminated. On appeal, Cummings argues that these facts, even if true, do not constitute a showing of duress under Tennessee law. It notes that duress must involve some type of unlawful restraint,

intimidation, oppression, undue influence, fraud, or illegal conduct designed to induce another to perform some act he is not legally bound to do. This was not shown in the instant case, Cummings asserts, because Dorgan was an at-will employee whose employment could have legally been terminated by Cummings at any time. Therefore, Cummings argues, threatening to fire Dorgan was merely the assertion of Cummings' legal right to end Dorgan's employment if he chose not to sign the contract.

In response, Dorgan does not dispute that the issue of duress turns on whether he was an at-will employee. Rather, he challenges Cummings' claim that he was employed at-will. Dorgan argues that the termination provision in the Revised Contract "very clearly permitted Cummings to terminate Mr. Dorgan *only for cause* ...." Therefore, threatening Dorgan with termination was an unlawful act used to force him into signing a contract that he otherwise would not have signed. Thus, Dorgan maintains, the trial court properly determined from the facts that Dorgan executed the 2004 Contract under duress, and consequently that it is unenforceable.

■■■ To review the trial court's finding, we first examine what constitutes legal duress sufficient to vitiate an otherwise valid contract. "Tennessee has long recognized that a contract, although valid on its face, may not be enforceable if it can be proved that the contracting party acted under duress." *Holloway v. Evers,* No. M2006–01644–COA–R3–CV, 2007 WL 4322128, at *8 (Tenn.Ct.App. Dec. 6, 2007). This principle is based on the premise that a contract is valid only if it is entered into freely, with the voluntary assent of the parties making it. *Id.* at *9. Early cases

recognized only physical duress as a basis on which to avoid business transactions.[12] In *Johnson v. Ford,* however, the Tennessee Supreme Court for the first time recognized that "duress of property" or "economic duress" "might, equally with duress of the person, entitle the party to recover back money paid under its influence." *Johnson v. Ford,* 147 Tenn. 63, 245 S.W. 531, 540 (1922). Later cases on duress rely on *Johnson:*

> "Economic duress" has been defined as:
>
> > [the] imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good conscience he ought not to be permitted to retain.

*Crocker v. Schneider,* 683 S.W.2d 335, 338–39 (Tenn.Ct.App.1984) (quoting *Johnson,* 245 S.W. at 539). In the case at bar, the trial court relied on a similar description of "duress," as stated in *Hardy v. Harris:*

> "Duress" is an unlawful restraint, intimidation or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination. The alleged coercive event must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a person of ordinary firmness. To constitute duress, the danger must not only exist, but must be shown to have actually operated upon the mind, and to have constituted the

12. *See, e.g., Willard v. Willard,* 65 Tenn. (6 Baxt.) 297 (1873) (shotgun wedding); *Pride v. Baker,* 64 S.W. 329 (Tenn.Ch.App.1901) (deed executed under threat of death), *cited in Holloway,* 2007 WL 4322128, at *8.

controlling motive for the performance of the act sought to be avoided.

*Hardy,* 1990 WL 61429, at *1–2 (citations omitted); *see also Rainey v. Rainey,* 795 S.W.2d 139, 147 (Tenn.Ct.App.1990) (quoting description of duress in *Simpson v. Harper,* 21 Tenn.App. 431, 111 S.W.2d 882, 886 (1937)). In sum, duress in the legal sense, whether physical or economic, exists "when one by the unlawful act of another is induced to make a contract or perform some other act which deprives him of the exercise of free will." *Johnson,* 245 S.W. at 538, *quoted in Holloway,* 2007 WL 4322128, at *9 (emphasis added). The common thread in each of these descriptions of "duress" is the concept that the contracting party was pressured by an unlawful or wrongful act, fraud, or oppression of another, forced to make a contract that the contracting party otherwise would have refused.

■ In this case, the trial court found that Dorgan signed the 2004 Contract under duress because, had he not signed the proffered 2004 Contract, Cummings would have "unilaterally terminate[d] the Revised Contract...." Despite Dorgan's reluctance to sign the 2004 Contract, the trial court found, he did so "at the behest of Mr. Malo who believed that [Dorgan] was going to be terminated if he did not sign." Thus, the trial court found that the potential loss of his job with Cummings forced Dorgan into executing the 2004 Contract, and that this constituted duress, making the 2004 Contract unenforceable.

■ In our view, the threshold issue on duress is whether, at the time Dorgan executed the 2004 Contract, Cummings had the legal right to terminate Dorgan's employment. "[T]he assertion of an inten-

tion ... to do what one has a legal right to do is insufficient to create duress." *Flynt Engineering Co. v. Cox,* 99 S.W.3d 99, 101–02 (Tenn.Ct.App.2002) (citation omitted); *see also Vickery Transp., Inc. v. HEPACO, Inc.,* No. W2003–01512–COA–R3–CV, 2004 WL 2280421, at *3 (Tenn.Ct. App. Oct. 4, 2004) (finding that insisting on a contract for services before beginning the clean-up operation was not "unlawful, wrongful, or coercive" and, thus, not duress). If Cummings had the legal right to terminate Dorgan's employment at the time he was required to execute the 2004 Contract, then Cummings' assertion of an intent to fire him if he refused to sign was simply the assertion of a legal right, and would not constitute duress. It is undisputed that Cummings did not have "cause" to terminate Dorgan. Consequently, we must ascertain whether, at the time Dorgan was required to execute the 2004 Contract, Cummings had the legal right to terminate his employment without cause.

■ Tennessee has long adhered to the doctrine of employment-at-will, which recognizes the right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong. *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 534–35 (Tenn.2002).[13] In Tennessee, employees are presumed to be employed at will in the absence of an agreement for employment for a term certain. *King v. TFE, Inc.,* 15 S.W.3d 457, 460 (Tenn.Ct. App.1999). Consequently, we must interpret the Revised Contract to determine whether it reflects intent to employ Dorgan for a term certain. If not, he is presumed to be an employee at-will, terminable without cause.[14]

---

**13.** Although there are exceptions to the employment-at-will doctrine, none of those ex-

ceptions has been advanced in this appeal. *See Guy,* 79 S.W.3d at 535.

**14.** The trial court did not explicitly address

Generally, the interpretation of a contract is a question of law, subject to *de novo* review. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn.2006); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999). When a contract is ambiguous and it is necessary to consider extrinsic evidence to properly interpret the contract, the issue becomes a mixed question of law and fact. *Allstar Consulting Group v. Trinity Church & Christian Ctr.*, No. W2006–00272–COA–R3–CV, 2007 WL 120046, at *3 (Tenn.Ct.App. Jan. 18, 2007). Therefore, while the underlying facts are reviewed under a *de novo* standard with a presumption of correctness, the legal conclusion arising from those facts is reviewed *de novo*, without such a presumption. *Id.* (citing *Newcomb v. Kohler Co.*, No. W2005–02161–COA–R3–CV, 2006 WL 2535396, at *28 (Tenn.Ct.App. Sept. 5, 2006)).

The interpretation of contracts is governed by well-settled principles. "[T]he cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention as best can be done consistent with legal principles." *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355, 360 (1955). Stated another way, "[t]he central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). We ascertain the parties' intention from what was "actually embodied and expressed in the instrument as written." *Petty*, 277 S.W.2d at 361. Where the language in a contract is clear and unambiguous, then its literal meaning controls the outcome of a contract dispute, and the court may not look beyond the four corners of the contract to ascertain the parties' intention. *See Planters Gin Co.*, 78 S.W.3d at 890; *Rogers v. First Tenn. Bank Nat'l Assn.*, 738 S.W.2d 635, 637 (Tenn.Ct.App.1987). All provisions of a contract should be construed in harmony with each other so as to give effect to each provision. *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn.2005).

A contract is ambiguous if its meaning is fairly subject to more than one interpretation. If a contract is ambiguous, then a court may look beyond the four corners of the document and consider extrinsic evidence in order to determine the parties' intention:

> [W]here a contractual provision is ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. Then, the court must examine other evidence to ascertain that intention. Such evidence might include the negotiations leading up to the contract, the course of conduct the parties followed as they performed the contract, and any utterances of the parties that might shed light upon their intentions.

*Stephenson v. The Third Co.*, M2002–02082–COA–R3–CV, 2004 WL 383317, at *4 (Tenn.Ct.App. Feb. 27, 2004) (citations omitted).

whether Dorgan was an employee-at-will or whether he was employed for a term certain under the Revised Contract. It stated, however, that, had Cummings "unilaterally terminate[d] the Revised Contract," it would have

"incurr[ed] liability to" Dorgan. We interpret this as a finding that, under the Revised Contract, Cummings agreed to employ Dorgan for the 3–year term of the agreement absent "cause" for termination.

Neither the Original Contract nor the Revised Contract is entitled as an employment agreement. The Original Contract is entitled "Commission Sales Compensation Program." The Revised Contract incorporates and continues the Original Contract, stating that "[t]he current Sales Agreement ... will stay in full force and effect until December 31, 2005." The first paragraph of the Original Contract plainly states that it "is not an Agreement to employ [Dorgan] for any specified length of time." All of this indicates an intent by the parties for Dorgan to remain an employee-at-will, with the contract to govern only how he is compensated while employed.

Paragraph seven of the Original Contract, however, includes a provision on "Termination," which states:

> The Company may terminate this Agreement at any time, and without advance notice *for cause.* Cause shall mean a violation by the Sales Executive [Dorgan] of any of the provisions of this Agreement, a violation of the Company's published code of ethics, standards of conduct, and/or working rules for salaried personnel, or for any other conduct which in the discretion of the Company is considered to be prejudicial to the best interest of the Company.
>
> \* \* \*
>
> Upon termination of this Agreement, the Sales Executive shall be entitled to receive any commissions which have been credited to his account but not yet paid as of the date of the termination, reduced by any draw received but not yet offset against prior commissions. The Sales Executive's final check will carry an appropriate endorsement on the back

> ... acknowledg[ing] that his commissions have been paid in full and releas[ing] the company from any future claims....

(Emphasis added.) The provision on termination contains no language referring to Cummings' right to terminate Dorgan *without* cause.[15] The description of "cause" does not relate at all to changing Dorgan's compensation, as one would expect in a contract that was intended to *only* be a compensation agreement. Instead, it clearly describes circumstances that would warrant termination of Dorgan's employment, referred to as terminating "this Agreement." It outlines how the Executive will receive his "final check" upon "termination of this Agreement." Thus, the language in this entire provision indicates an intent to employ Dorgan for a term certain, that is, the three-year duration of the Revised Contract. This is in direct contrast to the provision at the outset of the Original Contract specifically disclaiming any intent "to employ Sales Executive for any specified length of time."

Thus, we can only conclude that the Revised Contract can fairly be interpreted in more than one way and is, therefore, ambiguous. Accordingly, we must go beyond the literal meaning of the language in the written agreement and consider the rules of construction and extrinsic evidence of the parties' intent. *Stephenson,* 2004 WL 383317, at *4 (citations omitted).

In the trial court below, two Cummings representatives testified that the Revised Contract was not intended as an employment agreement, but that it was intended to be only a compensation agreement. Murray stated at the outset of his testimony that the contracts between Cummings

---

15. In contrast, the 2004 Contract states: "The Company may terminate this agreement with 30 days advance notice without cause."

and Dorgan were not employment contracts; rather, they were agreements that governed Dorgan's compensation while he was employed at Cummings. Steve Kerr also testified that Dorgan did not have an employment contract with Cummings.

In his own testimony, Dorgan testified that he negotiated the Revised Contract with Cummings. He did not disagree with Murray's characterization of the Original Contract and the Revised Contract as compensation agreements rather than employment agreements, and forthrightly confirmed his understanding that he was at all times an at-will employee, terminable at any time for any reason. Regarding the Original Contract and Revised Contract specifically, Dorgan indicated that he read the contracts and that he understood that they were "not a promise of continued employment with Cummings." On redirect examination, Dorgan testified:

Q: Now, you were asked whether any of these documents were a guarantee of employment.

A: I was asked that.

Q: Okay. And were they a guarantee of employment?

A: No sir.

Q: What was your understanding as to what you were getting when you signed the 1998 contract and the 2003 supplement, as well as the 2004 contract? What were the terms that you understood you were dealing with?

A: The commission structure, how I would be paid. Also, what would happen if I wanted—if Cummings was to change this contract, what would happen, how they would go about doing that, having me approve it, sign it. Every tenet within the contracts, I understood them.

Despite acknowledging that he was an at-will employee, Dorgan insisted that, although his employment could have been terminated at any time, he believed that the Revised Contract should have remained in effect through December 2005 while he was employed at Cummings. This is consistent with an intent to enter into an agreement governing compensation, not an employment agreement.

Thus, the testimony at trial establishes both parties' intent in executing both the Original Contract and the Revised Contract that Dorgan remain an at-will employee. Under these circumstances, we must conclude that the evidence preponderates against the trial court's implicit finding that Dorgan was employed for a term certain under the Revised Contract. Therefore, at the time Dorgan executed the 2004 Contract, Cummings had the legal right to terminate his employment at any time, for any reason. The trial court found that Dorgan signed the 2004 Contract only because he was told to "either sign for the 2004 contract or lose his employment." However harsh it may be, Cummings had a legal right to terminate Dorgan if he refused to execute the 2004 Contract. Thus, if Cummings communicated to Dorgan that his failure to sign the 2004 Contract would result in his termination, this is merely "the assertion of an intention ... to do what one has a legal right to do" and "is insufficient to create duress." *Flynt Engineering*, 99 S.W.3d at 102.

For these reasons, we reverse the trial court's conclusion that the 2004 Contract was executed by Dorgan under duress and, thus, was unenforceable. Therefore, the 2004 Contract remained in full force and effect through the remainder of Dorgan's employment at Cummings.

### Remaining Issues

 This holding pretermits the issue raised by Cummings of whether Dorgan

ratified the 2004 Contract through his subsequent conduct. It also pretermits issues raised by Cummings regarding the trial court's calculation of damages and post-judgment interest.

We now address Dorgan's arguments on appeal. Dorgan argues on appeal that, like the 2004 Contract, the 2004 Non–Compete Agreement was unenforceable because it, too, was signed under duress, and it was not supported by sufficient consideration. For the reasons supporting our holding that the 2004 Contract was not signed under duress, we likewise conclude that the 2004 Non–Compete Agreement was not executed under duress. In addition, the 2004 Non–Compete Agreement was clearly supported by adequate consideration. As an at-will employee, Dorgan's continued employment by Cummings was consideration for his execution of the 2004 Non–Compete Agreement. *Ramsey v. Mut. Supply Co.*, 58 Tenn.App. 164, 427 S.W.2d 849, 852–53 (1968). Moreover, in the 2004 Contract, Dorgan agreed to execute the 2004 Non–Compete Agreement. Therefore, we reject Dorgan's argument and affirm the trial court's holding that the 2004 Non–Compete Agreement was enforceable.

■■■ Dorgan also argues that the trial court erred in refusing to grant him vacation pay for his accrued 160 hours of vacation for 2005. In his initial complaint, Dorgan argued that he was entitled to this compensation pursuant to Section 50–2–103(a)(3). This statute provides:

(a) All wages and compensation of employees in private employments shall be due and payable as follows:

. . .

(3) For the purpose of this subsection (a), the final wages of an employee who quits or is discharged shall include any vacation pay or other compensatory time that is owed to the employee by virtue of company policy or labor agreement. This subdivision (a)(3) does not mandate employers to provide vacations, either paid or unpaid, nor does it require that employers establish written vacation pay policies.

Tenn.Code Ann. § 50–2–103(a)(3) (2008). The relevant provisions contained in Cummings' vacation policy are as follows:

Vacation Benefits are provided by the Company to employees based on the expectation of continued future employment, therefore, employees whose employment ends with Cummings, Inc. Will NOT be paid for vacation Accumulated But Not Taken except for employees retiring or employees being laid-off.

The trial court found that Dorgan was not entitled to vacation pay under this policy because he resigned from Cummings and was not retiring or being laid off.

On appeal, Dorgan argues that Cummings' vacation policy should not apply to him, because his termination was the indirect result of Cummings' breach of contract, and because he was essentially constructively discharged because of Cummings' continued breach of contract. Furthermore, he claims, that evidence showed that he did not receive notice of this policy until the day that he resigned from Cummings. His final pay stub dated January 20, 2006, indicated that he had 160 vacation hours available. Therefore, he claims, "[i]t is equitable to award Mr. Dorgan, for his four weeks . . . of vacation time."

Our conclusion that the 2004 Contract was not signed under duress undermines much of Dorgan's argument that he is entitled to his 2005 vacation pay due to Cummings' breach of contract. We find no caselaw supporting Dorgan's assertion that the trial court can award him vacation

pay based on equitable principles. Therefore, we affirm the trial court's denial of Dorgan's claim for vacation pay.

As set forth above, we have concluded that the 2004 Contract was in full force and effect through the remainder of Dorgan's employment. At trial, Dorgan argued that Cummings breached the 2004 Contract in several ways, including ceasing commission payments during the last six months of his employment. Because the trial court concluded that the 2004 Contract was void, it did not address Dorgan's claim that Cummings breached that contract. In light of our holding, we remand this case to the trial court to address Dorgan's claim that Cummings breached the 2004 Contract.

### CONCLUSION

We reverse the trial court's finding that the 2004 Contract was unenforceable because it was executed under duress. We affirm the trial court's holding that the Non–Compete Contract is enforceable. We affirm the trial court's denial of Dorgan's claim for accrued vacation pay. These holdings pretermit many of the issues raised on appeal. To the extent that the remaining issues are not pretermitted, they are affirmed for the reasons stated. The cause is remanded to the trial court for consideration of Dorgan's claim that Cummings breached the 2004 Contract.

The decision of the trial court is reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion. Costs on appeal are to be taxed one-half to Appellant Cummings, Inc., and its surety, and one-half to Appellee Terry J. Dorgan, Jr., for which execution may issue, if necessary.

### ORDER DENYING PETITION TO REHEAR

The Appellee Terry J. Dorgan, Jr. has filed a Petition to Rehear. After due consideration, the Petition to Rehear is **DENIED**.

**It is SO ORDERED.**