IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 27, 2010 Session

## SAMMIE MANESS and SKM WOOD PRODUCTS, LLC
v.
## JOANNIE COLLINS, MIKE SMITH, JOSH SMITH and SKM, LLC

Appeal from the Chancery Court for McNairy County
No. 8319    William C. Cole, Chancellor

No. W2008-00941-COA-R3-CV - Filed November 17, 2010

This appeal involves an employment contract. The plaintiff employee owned a manufacturing business. He sold the business to the defendant new owners, and agreed to stay on as a management-level employee. To that end, the plaintiff entered into a three-year employment agreement with the company, and signed a non-competition agreement. After a few months, the company's new owners terminated the plaintiff employee on the basis that he had not fulfilled his job duties. The plaintiff filed this lawsuit against the company and the new owners, alleging breach of the employment agreement. After a bench trial, the trial court held that the company breached the employment agreement by terminating the plaintiff's employment without cause, finding that one of the new owners prevented the plaintiff from performing his job duties. However, the trial court declined to award damages to the plaintiff employee because the plaintiff did not seek other employment, and thus failed to mitigate his damages. Both parties appeal. We affirm the trial court's finding that the company breached the employment agreement, finding that one of the new owners prevented the plaintiff from performing his job duties, and therefore the plaintiff's failure to perform under the employment agreement was excused. We reverse the trial court's holding on mitigation of damages, finding that the defendant company and the new owners were required to prove the availability of suitable and comparable substitute employment, and failed to do so.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

HOLLY M. KIRBY, J.,, delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Terry L. Wood, Wilson, Hunton & Wood, P.A., Corinth, Mississippi, for Plaintiff/ Appellant, Sammie Maness and SKM Wood Products, LLC.

Terry Abernathy, Selmer, Tennessee, for Defendants/Appellees, Joannie Collins, Mike Smith, Josh Smith, and SKM, LLC.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Plaintiff/Appellant Sammie Maness ("Maness"), in his 50s at all pertinent times, lived most of his life in McNairy County, Tennessee. Much of his work life was spent doing hourly work, such as construction, maintenance, working as a mill operator, or working as a carpenter. In 1997, Maness incorporated his own wood manufacturing business in Adamsville, Tennessee, making table tops for a local sewing company. For a couple of years, Maness worked part-time for his new business. In time, the sewing company business diminished, but Maness's new company began making wooden bases and support parts for bath tubs for Aqua Glass, a local company whose business apparently involved manufacturing bath tubs. As the work from Aqua Glass increased, by 1999, Maness's company became his full-time occupation. In 2001, Maness's manufacturing company, Plaintiff SKM Wood Products, LLC (" SKM"), moved to a new facility in Adamsville. Within several years, SKM grew to have annual sales of several million dollars, with approximately twenty-five employees. SKM's primary customer remained bath tub manufacturer Aqua Glass.

In 2005, Defendant/Appellee Joannie Collins ("Collins") approached Maness about the possibility of purchasing SKM.[1] After several meetings, Collins told Maness that her brother-in-law, Defendant/Appellee Mike Smith ("Mike Smith"), and his son, Collins' nephew, Defendant/ Appellee Josh Smith ("Josh Smith"), would be her partners in purchasing and operating the business. Mike Smith took the lead role in negotiating the sale. Not long before the negotiations began, Josh Smith was hospitalized for treatment for drug addiction issues; this fact was not disclosed to Maness during the negotiations.

The three purchasers expected to take on different roles in the newly acquired business. Collins, a certified public accountant, expected to maintain her full-time employment as a financial advisor and handle the new business's payroll and financial matters on a part-time

---

[1]Collins had been a friend of Maness's deceased wife. Maness had known both Collins and Mike Smith for many years. Prior to 2005, Collins and Mike Smith, with others, approached Maness about investing in SKM, but nothing was done at that time.

basis. Similarly, Mike Smith expected to keep his full-time employment elsewhere and work part-time at SKM. Josh Smith had a college degree in business and marketing and had worked for a woodworking company; he was expected to be the "managing member," that is, to work full-time at SKM, supervising and managing the day-to-day operations. Part of Mike Smith's motivation in acquiring SKM was to have a business for Josh Smith as well as his other son. All parties expected that, after the acquisition, Maness would remain with SKM as an employee.

In anticipation of the acquisition, in the fall of 2005, Josh Smith was hired by SKM and began working under Maness's supervision. Maness was somewhat disappointed by Josh Smith's job performance at that point, but the record does not indicate that he voiced any concerns about Josh Smith to any of the purchasers.

On January 13, 2006, the parties executed an asset purchase agreement under which SKM's assets were sold to SKM, LLC, with Collins, Mike Smith, and Josh Smith as guarantors.[2] Part of the total $1,300,000 purchase price was paid by a $300,000 promissory note guaranteed by Collins, Mike Smith, and Josh Smith. The new ownership of SKM was structured such that Collins owned one-third, Mike Smith owned one-third, and Josh Smith owned one-third.

The asset purchase agreement provided for SKM to employ Maness for three years, at an annual salary of $67,600. It stated:

> As an integral part of this Agreement, the Purchaser [SKM, LLC] agrees to employ Sammie Maness, with the beginning date of such employment to be the date of the closing of this transaction for a period thereafter of not less than three (3) years, provided that the Company shall maintain the current sales volume and for so long as the Company shall not suffer any material interruption of its business by causes beyond its control. During the term of Maness' employment, he shall generally serve as the Company's Production Manager and shall be paid an annual salary of Sixty-Seven Thousand Six Hundred Dollars ($67,600.00). . . .

---

[2]After the acquisition, the name of the business was changed to SKM, LLC. For simplicity, in this opinion, we shall continue to refer to the business as "SKM."

Attached to the asset purchase agreement was a job description for Maness as an employee of SKM.[3]

On the same day, in conjunction with the asset purchase agreement, Maness also signed a non-competition and non-solicitation agreement. The non-competition provision stated that Maness would not:

> ...for a period of five (5) years following his termination of employment, for whatever reasons, with SKM, LLC by himself or by or through any other person or entity, whether as a shareholder, owner partner, joint venturer, employee, agent, contractor, consultant, directly or indirectly compete with the Company within the Restricted Area. The "Restricted Area" shall mean within the continental United States of America.

Thus, the noncompetition agreement had a geographic area of the entire continental United States, for a time period of five years after Maness's employment with SKM ended.

On the effective date of the asset purchase agreement, in mid-January 2006, Maness began his employment as SKM's Production Manager. As expected, Collins and Mike Smith worked at SKM no more than a few hours per week. Josh Smith worked full-time at SKM. At the time of the purchase, most of SKM's sales came from customer Aqua Glass. A primary aim of purchasers Collins, Mike Smith and Josh Smith was to bring in additional customers and to diversify SKM's customer base.

Initially, the parties' working relationship was reasonably harmonious. However, conflicts quickly arose. As Maness continued to discipline employees as he always had, the new owners perceived his interactions with the employees as unacceptably confrontational. Maness felt that, under the new ownership, SKM's employees became increasingly disrespectful toward him.

---

[3]The job description states that Maness was to:

> Schedule the cutting department;
> Work with Josh Smith on purchasing and scheduling incoming materials;
> Coordinate maintenance on all equipment, forklifts, and vehicles;
> Work with Chad Smith on maintenance and training on safety and OSHA compliance;
> Work with Josh Smith, so he can schedule the frame-line, panel saw, and CNC;
> Work on special projects;
> Work with Josh Smith on developing new business; and
> Train all new hires.

-4-

The problems came to a head in March 2006, when Maness fired an employee after a heated confrontation in which the employee spoke to Maness in a manner that he perceived as disrespectful of his authority. Afterward, the new owners admonished Maness for the termination and rehired the employee. The new owners indicated to Maness that he did not have the authority to discharge employees.

Maness's working relationship with the new owners deteriorated precipitously after that. By all accounts, Maness became unhappy and did much less work, spending considerable time in his office, essentially idle. The parties disputed the reason for Maness's behavior.

Finally, on May 16, 2006, the new owners terminated Maness's employment with SKM. As reason for termination, the termination notice stated: "Have not fulfilled job duties, according to our original agreement, your actions and attitude have been detrimental to the success of this Company."

On July 6, 2006, Maness filed a lawsuit in the Chancery Court of McNairy County against Collins, Mike Smith, Josh Smith, and SKM, LLC.[4] The complaint alleged breach of Maness's employment agreement, and asserted that the non-competition agreement was unenforceable. The complaint sought a judgment for the unpaid compensation under Maness's employment contract, pre-judgment interest, post-judgment interest, attorney fees and costs, as well as a declaration that the non-competition agreement was unenforceable.

SKM, Collins, Mike Smith, and Josh Smith filed an answer to the complaint, asserting that Maness's employment was terminated for legal and justifiable cause, and that the non-competition agreement was valid and enforceable. Discovery ensued.

The trial court conducted a bench trial over two days in March 2008, specifically March 17 and 28, 2008. The trial court heard testimony from Maness, Mike Smith, Collins, and Josh Smith, as well as some former and current employees of SKM.

Maness testified at the outset of the trial. Prior to the acquisition, Maness said, Josh Smith was not a particularly good employee, but Maness was able to work with him on some tasks. After the acquisition, as Maness would walk through the plant correcting employees on transgressions such as safety violations, Maness noticed that the employees acted in an increasingly disrespectful and belligerent manner towards him. After Maness fired the

---

[4]In the complaint, SKM Wood Products, LLC was also a Plaintiff; it sought acceleration of the payments due under the promissory note. The claim on the promissory note was the only claim asserted by SKM Wood Products, LLC. This claim was dismissed by the trial court at the conclusion of the Plaintiff's proof and is not an issue in this appeal. Thus, SKM Wood Products, LLC raises no issues in this appeal.

disrespectful problem employee and the new owners reinstated him, Maness said, he told the new owners that they had undercut his authority. Maness said that the new owners responded by telling him that he no longer had the authority to discipline or terminate employees.

After that, Maness claimed, Josh Smith held a meeting with the SKM employees in which he told them that Maness no longer had any authority to correct employees or tell them what to do. Josh Smith did not inform Maness of this meeting. Maness alleged that "every time [he] tried to do anything, correct people, quality, safety or anything, [he] was told that wasn't [his] job, [and] not to do it." When he complained, Maness claimed, Mike Smith told him to just stay in his office at his desk and draw his money.

Subsequently, on an occasion when Maness came to SKM at an unusually early hour, he observed Josh Smith in what appeared to be a drug transaction. He told Collins what he had seen. Not long after that, the new owners terminated Maness's employment.

On cross-examination, Maness conceded that the new owners told him that his management style was too confrontational; Maness disagreed with their characterization. He also admitted that the new owners wanted to expand SKM's customer base beyond Aqua Glass, and that he did not care about such expansion.

Since his employment with SKM ended, Maness said, he had not been employed. Maness conceded that, after his termination, he did not seek new employment, but instead focused on building a new house for himself.

After Maness's testimony, a former SKM employee testified that Josh Smith talked with him about ideas for getting Maness to leave SKM. The former employee corroborated Maness's testimony that Josh Smith held a meeting at which SKM employees were told that Maness was no longer an owner, so they did not need to listen to him. Another former SKM employee testified that, several weeks after the acquisition, Josh Smith told employees that Maness would not be with SKM much longer. Both former employees described Josh Smith's extensive drug use while on the job at SKM and his drug transactions with SKM employees. That concluded Maness's case-in-chief.

Collins and Mike Smith both testified that the working relationship with Maness started amicably, but soon inexplicably deteriorated. Both acknowledged that their work time at the SKM plant was limited; for information on Maness's job performance, they relied in part on Josh Smith and others. Prior to the acquisition, neither Collins nor Mike Smith were aware that Josh Smith had undergone treatment for drug addiction. Both Collins and Mike Smith received some indication, only shortly before Maness's termination, that Josh Smith was using drugs; however, neither was aware of the extent of the younger Smith's drug problem

until after Maness was let go. At the time Maness's employment was terminated, neither were aware of reports that Josh Smith had tried to get rid of Maness or that he had held a meeting with employees to tell them that they need not listen to Maness; in their testimony, neither would concede that such a meeting in fact occurred.

Collins and Mike Smith both testified that Maness was resistant to the new owners' efforts to get customers beyond Aqua Glass. Both maintained that, after SKM decided to rehire the problem employee whom Maness had fired, Maness's work attitude soured and he essentially stopped working. Collins testified that Maness "sulked up like an old possum." Mike Smith denied telling Maness to just sit in his office and draw his pay. Both Collins and Mike Smith insisted that there was just cause to terminate Maness's employment.

Josh Smith testified as well. He said that his drug problems begin in 2005, and that he was addicted to a variety of drugs, prescription and otherwise. He underwent treatment for substance abuse in September 2005, shortly before he began working for SKM.[5] To his knowledge, neither his father, Mike Smith, nor his aunt, Collins, nor Maness were aware of his past substance abuse. Josh Smith admitted that he used drugs on the premises of SKM throughout his employment there. He denied buying or selling drugs on the premises of SKM, and maintained that his drug use did not affect his work performance.

In his testimony, Josh Smith denied having a meeting with the SKM employees in which he told them that they were no longer required to listen to Maness, and he denied asking employees to help him get rid of Maness. He maintained that Maness was often confrontational with the employees, and that Maness made no attempt to get new customers. After the new owners rehired the employee Maness had fired, Josh Smith testified, Maness did little work, and began spending most of his work time in his office playing solitaire, and repeatedly asking Collins, Mike Smith, and Josh Smith to buy out the remainder of his contract. Josh Smith confirmed that, at this point, he did not want Maness dealing directly with the employees. He testified that the decision to terminate Maness's employment was made by he, Collins and Mike Smith together, and that the decision was not made hastily.[6]

At the conclusion of the testimony, the trial court issued an oral ruling. At the outset of its ruling, the trial court noted that no proof had been presented on the enforceability of the noncompete agreement. Consequently, Maness's claim for declaratory relief on the noncompetition agreement was dismissed without prejudice. The trial court then addressed

---

[5]Josh Smith did not complete the recommended drug treatment at that time.

[6]By the time of trial, Josh Smith was enrolled in a drug treatment program and had been drug-free for many months.

whether the defendants had breached the employment agreement by terminating Maness's employment.

The trial judge found that Josh Smith was responsible for the daily operations of SKM, and that he suffered from "extreme drug addiction." It found that Maness's work performance was generally satisfactory until the new owners rescinded Maness's firing of the problem employee. After that, the trial court said, "everything went downhill." The trial judge credited the testimony of witnesses who testified that, unbeknownst to Mike Smith and Collins, Josh Smith attempted to undercut Maness's authority and to have Maness's employment terminated. The trial judge observed that Maness, by "sulk[ing] up and sitting at a desk, and saying send me home," conducted himself in a less-than-professional manner, but the trial judge noted as well that Maness was dealing daily with "a drug-addicted business owner," namely, Josh Smith. The trial court found that the defendants did not meet their burden of proof to show just cause for terminating Maness's employment under the employment agreement.

Regarding the issue of damages, the trial court noted that, after his termination, Maness spent a year building a house and did not take any action to seek employment. The trial court found that Maness, as a wrongfully terminated employee, had a duty to mitigate his damages, but instead took no action. At that point, the trial court asked the attorneys for argument on the issue of mitigation of damages. Maness's attorney argued that the defendants' attorney had the burden to show that there was comparable, suitable employment available to Maness, had he looked for a job. Especially in light of the noncompetition agreement, he contended, the defendants' burden was not met. In response, the defendants' attorney argued that, since Maness made no effort to find work, employer SKM had no obligation to show the availability of substantially similar employment in the geographic area. After hearing the arguments, the trial judge determined that, in light of Maness's failure to make any effort to find work, Maness failed to mitigate his damages. It concluded that Maness's failure to mitigate damages prohibited any award for damages.

On April 21, 2008, the trial court entered a written order, attaching a transcript of its prior oral ruling. It found that the defendants did not have cause to terminate Maness's employment, but that Maness failed to mitigate his damages. Thus, it awarded Maness no damages.

Maness now appeals, and Collins, Mike Smith, and Josh Smith cross-appeal.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

On appeal, SKM, Collins, Mike Smith, and Josh Smith argue that the trial court erred in finding that Maness was terminated from his employment with SKM without cause. Maness asserts on appeal that the trial court erred in considering the affirmative defense of mitigation of damages when neither SKM nor the new owners asserted, either in their pleadings or at trial, that Maness had a duty to mitigate his damages. In addition, Maness argues that the trial court erred in denying Maness damages when SKM and the new owners produced no evidence that comparable employment was available to Maness.

On appeal, the trial court's findings of fact are reviewed *de novo* with a presumption of correctness, unless the evidence preponderates to the contrary. TENN. R. APP. P. 13(d). To the extent that a trial court's factual determinations were based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Barrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *Nashville Ford Tractor, Inc. v. Great American Insurance Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005) (citing *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998).

**ANALYSIS**

**Breach of Employment Contract**

We consider first the issue raised on appeal by SKM, Collins, Mike Smith, and Josh Smith, that the trial court erred in determining that SKM breached the employment agreement with Maness by terminating Maness's employment without cause. They assert that Maness was terminated for cause, citing the description of good cause for termination contained in *Biggs v. Reinsman Equestrian Products, Inc.*, 169 S.W.3d 218, 221 (Tenn. Ct. App. 2004) (citing *Video Catalog Channel, Inc. v. Blackwelder*, No. 03A01-9705-CH-00155, 1997 WL 581120 (Tenn. Ct. App. Sept. 19, 1997) ("good cause exists . . . where the discharge is objectively reasonable.").

SKM, Collins, Mike Smith, and Josh Smith acknowledge that the trial court's finding of no cause was based in part on the trial court's assessment of the credibility of the witnesses. They argue that Josh Smith's admitted drug use was no excuse for Maness to "sulk" and refuse to do his job. Relying on Maness's own testimony and the testimony of witnesses credited by the trial court, they argue that the undisputed proof shows that Maness utilized an inappropriately confrontational management style when dealing with SKM employees, and that he spent most of his time at work doing nothing or playing games on his computer.

They assert that Maness's "failure to perform express or implied duties" gave SKM the right to terminate his employment contract for cause, prior to the expiration of its term, without incurring liability, citing *Biggs*, 169 S.W.3d at 221. They also contend that Maness's conduct amounted to job-related grounds for termination of his employment, which also constitutes cause. They cite *Lawrence v. Rollins*, No. M1997-002233-COA-R3-CV, 2001 WL 76266 (Tenn. Ct. App. Jan. 30, 2001), in support.

Tennessee has long adhered to the doctrine of employment-at-will, which recognizes the right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.w.3d 528, 534-35 (Tenn. 2002); *Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 332 (Tenn. Ct. App. 2009). In Tennessee, employees are presumed to be employed at will in the absence of an agreement for employment for a term certain. *Cummings, Inc.*, 320 S.W.3d at 332; *King v. TFE, Inc.*, 15 S.W.3d 457, 460 (Tenn. Ct. App. 1999). In this case, Maness's employment with SKM is governed by Article 8 of the asset purchase agreement, which provides for Maness's employment as a Production Manager for SKM. Generally, the interpretation of a contract is a question of law, subject to *de novo* review. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Cummings*, 320 S.W.3d at 333.

The interpretation of contracts is governed by well-settled principles. "[T]he cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention as best can be done consistent with legal principles." *Cummings*, 320 S.W.3d at 333 (quoting *Petty v. Sloan*, 277 S.W.2d 355, 360 (Tenn. 1955)). We ascertain the parties' intent from what was "actually embodied and expressed in the instrument as written." *Petty*, 277 S.W.2d at 361.

In the case at bar, the asset purchase agreement provides for Maness's employment by SKM for a term of three years. Often, an employment contract for a term certain will expressly provide that the employee may be terminated "for cause" or "for good cause." *See, e.g., Worley v. Lister Distribution, Inc.*, No. E2005-02932-COA-R3-CV, 2006 WL 1684748 (Tenn. Ct. App. June 20, 2006). In this case, the employment agreement contains no such language. It states only that SKM "agrees to employ [Maness] for a period . . . of not less than three (3) years . . . ." The only stated proviso to SKM's obligation to employ Maness is that SKM maintain its sales volume and not suffer any "material interruption of its business." The record contains no indication of a business interruption for SKM, and the trial court specifically found that SKM's sales volume had increased. The contract indicates no other circumstance under which SKM is relieved of its obligation to employ Maness for the mandated term. Thus, under the plain language of the employment agreement, SKM had an essentially unqualified obligation to employ Maness for a period of three years, at a salary

of $67,600 per year.  In general, courts will not rewrite an agreement and "will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise."  ***Wages v. Life Care Centers of America, Inc.***, No. 2006-01054-COA-R3-CV, 2007 WL 4224723, at *11 (Tenn. Ct. App. Nov. 30, 2007) (quoting ***Vargo v. Lincoln Brass Works, Inc.***, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003)).

However, there is authority in Tennessee to the effect that, even where an employment agreement is for a definite term, the employer may nevertheless discharge the employee for just cause.  ***See Trabue, Inc. v. Professional Management-Automotive, Inc.***, 589 S.W.2d 661, 663 (Tenn. 1970); ***Curtis v. Reeves***, 736 S.W.2d 108, 110-11 (Tenn. Ct. App. 1987) (citing ***Trabue***).  Thus, we assume that, despite the unambiguous language in Maness's employment agreement, SKM retained the right to terminate his employment for just cause.

As noted by SKM and the new owners, the trial court found that Maness "was sulked up and sitting at a desk," and "saying send me home."  We agree that this indicates that Maness did not perform his job duties under the employment contract.  Viewed in isolation, this could be seen as cause for termination under the caselaw cited by SKM, Collins, Mike Smith, and Josh Smith.  ***See Biggs***, 169 S.W.3d at 221 ("Sub-performance that compromises the employer's interest or impedes the company's progress will justify the termination for cause.") (citations omitted); ***Lawrence***, 2001 WL 76266, at *5 ("poor job performance, or failure in the execution of assigned duties," may constitute cause for termination.) (citation omitted).

The trial court, however, did not view Maness's actions in isolation; rather, it viewed Maness's failure to perform his function as Production Manager in the context of the workplace disruption it found that Josh Smith created.  Specifically, the trial court noted that Maness dealt each day with an owner, Josh Smith, who undercut Maness's authority as a manager, tried to "foment dissent with the employees," sought Maness's removal, and generally prevented him from effectively carrying out his job duties.  On this basis, the trial court held that SKM, Collins, Mike Smith, and Josh Smith did not meet their burden of proof to show cause for the termination of Maness's employment.

Our courts have recognized that each party to a contract is "under an implied obligation to restrain from doing any act that would delay or prevent the other party's performance of the contract" and that "[e]ach party has the right to proceed free of hindrance by the other party."  ***ACG, Inc. v. Southeast Elevator, Inc.***, 912 S.W.2d 163, 168 (Tenn. Ct. App. 1995).  In ***German v. Ford***, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009), this Court elaborated on this principle:

[E]very contract imposes on the parties a duty of good faith and fair dealing in its performance. RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). For example, every contract includes an implied condition that one party will not prevent performance by the other party. *See Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 678 (Tenn. Ct. App. 2007) (citation omitted). This is easily seen where the prevention of the other party's performance takes the form of active hindrance:

In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him . . ., it is nearly always a breach of contract for the other party to act so as to prevent . . . the performance of the condition. It is a breach of duty, only because the court finds a promise by implication not to prevent or hinder.

6 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 571 (Interim ed.). *See Frank Fitzgerald, Inc. v. Pacella Bros.*, 310 N.E.2d 379, 381 (Mass. App. Ct. 1974) (holding that the subcontractor had a right to recover from the general contractor under the contract despite the subcontractor's failure to fully perform because the subcontractor's work was halted by an agent of the general contractor). Where the plaintiff's performance has been wrongfully prevented or hindered by the conduct of the defendant, "[o]nly the law of the jungle would say that plaintiff's failure to perform should not be excused." PERILLO, *supra*, § 11.28.

*German v. Ford*, 300 S.W.3d at 706. The *German* Court noted the consequence of such active hindrance of the other party's performance of his contractual obligations: "[A]ctive prevention of another's performance . . . may excuse performance by the other party." *Id.* at 707; *accord*, *United States v. Peck*, 102 U.S. 64, 66, 1880 WL 18883, at ** 1 (1880) ("the conduct of one party to a contract which prevents the other from performing his part is an excuse for non-performance."). If performance under the contract is excused, it means that even if performance of the plaintiff's contractual obligation "did not take place, the plaintiff may recover *on the contract* provided it is proved that plaintiff would have been ready, willing and able to perform but for the prevention." JOSEPH M. PERILLO, CALAMARI AND PERILLO ON CONTRACTS 453-54 ThomsonWest (5th ed. 2003) (emphasis in original).

In the instant case, the trial court made a factual finding that Josh Smith's actions effectively prevented Maness from functioning as a Production Manager for SKM. This factual finding hinged on the trial court's assessment of the witnesses' credibility. Josh Smith's disavowal of any such actions was not credited by the trial court. Instead, the testimony of Maness and the former SKM employees, that Josh Smith fomented dissent against Maness, undercut his

authority, and sought to get rid of him, was credited. On appeal, the appellate court is obliged to give great deference to the trial court's assessment of the witnesses' credibility. *Cornelius v. DCS*, 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). According appropriate deference to the credibility determinations of the trial court below, we find that the trial court's factual findings in this regard are supported by the preponderance of the evidence. Under these circumstances, if Josh Smith prevented Maness from performing his job duties under the employment agreement, then Maness's performance was excused. This means that SKM and the new owners were without cause to terminate his employment, and that Maness may recover under the contract. Therefore, we affirm the finding of the trial court that Maness was terminated from his employment without cause.

### Mitigation of Damages

Maness asserts on appeal that the trial court erred in applying the affirmative defense of mitigation of damages, when there was no claim either in the pleadings or during the trial that Maness had a duty to mitigate his damages and failed to do so. In response, Collins, Mike Smith, and Josh Smith argue that, under Rule 15.02 of the Tennessee Rules of Civil Procedure, the issue was tried by express or implied consent. *See Farrar v. Farrar*, 553 S.W.2d 741, 744 (Tenn. 1977).

On the substantive issue of mitigation of damages, Maness asserts that the trial court erred in declining to award Maness damages where there was no evidence at trial that comparable, suitable employment was available to Maness. Maness maintains that, under *Frye v. Memphis State Univ*., 806 S.W.2d 170 (Tenn. 1991), it would have been futile for Maness to seek other employment. *Id*. at 173. He contends that the noncompetition agreement, prohibiting employment with a competitor anywhere in the United States for a period of five years, prevented him from seeking comparable employment.

Maness asserts that, under *Frye*, "the employer must prove both the availability of suitable and comparable substitute employment and a lack of reasonable diligence on the part of the employee." *Id*. (citing *Raismas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983). Maness argues that at no point during the trial did SKM and the new owners offer evidence of comparable, suitable employment for Maness.

In response, SKM and the new owners note that, without question, Maness had a duty to mitigate his damages, and that it is undisputed that he made no effort whatsoever to find substitute employment. They acknowledge candidly that they offered no proof of suitable, comparable alternative employment available to Maness. They argue somewhat hopefully on appeal that this case would be an excellent opportunity for this Court to adopt the

exception noted in the case of **Barnes v. Goodyear Tire and Rubber Co.**, No. W2000-01607-COA-RM-CV, 2001 WL 568033 (Tenn. Ct. App. May 25, 2001). In **Barnes**, the Court stated:

> Some courts have carved out another exception to the general rule, holding that an employer is released from the duty to prove the availability of substantially equivalent employment if the employer proves that an employee has not made any reasonable efforts to obtain such work . . . . This exception has not been addressed in Tennessee.

**Id.** at *6 (citations omitted). The **Barnes** Court declined to adopt the exception based on the facts in that case. **Id.** at *7.

In the alternative, SKM and the new owners argue that Maness should be bound by the following language in the noncompetition agreement: "Maness acknowledges that his skills are such that he could easily find alternative, commensurate employment or work that would not violate the provisions of this Agreement. . . ."

In the instant case, Maness seeks damages for the breach of his employment contract; he contends that, had his employment not been wrongfully terminated, he would have been paid the agreed-upon salary for three years. "Although liability for breach of contract is primarily based on a no-fault principle, . . . a party who has been wronged by a breach of contract may not unreasonably sit idly by and allow damages to accumulate." PERILLO, *supra*, at 584. This is the doctrine of avoidable consequences, often referred to as the plaintiff's obligation to mitigate his damages. *See* 22 AM. JUR. 2D *Damages* §§ 340, 345, 360 (2010). Thus, where a party seeks damages for breach of contract, courts will enforce the plaintiff's duty to mitigate or reduce his damages incurred after the other party's breach. *See* Feldman 22 TENN. PRAC. CONTRACT LAW AND PRACTICE § 2:32 (2010). In the context of the breach of an employment contract by the employer, the terminated employee's damages "consist of compensation that the employee who has been wrongfully discharged would have received if the contract had been carried out according to its terms, provided that the employee has been unable to find comparable employment . . . ." 22 AM. JUR. 2d § 101 (2010). *See Frye*, 806 S.W.2d at 173. *See also Denney v. Lovett*, No. M2004-03020-COA-R3-CV, 2006 WL 1915303, at *9 (Tenn. Ct. App. July 11, 2006).

The failure to mitigate damages is an affirmative defense. **Id.** In Tennessee, "the employer must prove both availability of suitable and comparable substitute employment and a lack of reasonable diligence on the part of the employee." **Frye**, 806 S.W.2d at 173. In light of their failure to proffer evidence of suitable comparable substitute employment for Maness, SKM and the new owners urge this Court to adopt the exception referred to in **Barnes**. We must

-14-

respectfully decline to do so. First, adopting such an exception renders problematic the calculation of the plaintiff employee's damages. The plaintiff's failure to mitigate his damages does not *per se* preclude him from recovering any damages whatsoever; rather, "recovery is diminished only to the extent that the plaintiff fails to mitigate the damages as they would be mitigated by an ordinary, reasonable person under similar circumstances." 22 AM. JUR.2d § 336 (2010). Thus, only the amount that the plaintiff would have earned in the exercise of reasonable diligence is applied to reduce his contractual damages. *See, e.g., Barnes*, 2001 WL 568033, at *5 ("A back pay award must be reduced by any . . . amounts that [the employee] could have earned had the employee exercised reasonable diligence.") (citations omitted). Therefore, the plaintiff is precluded from recovering damages *only* if the proof shows that the amount he would have earned in the exercise of reasonable diligence equaled or exceeded the amount he would have earned under the original employment agreement. *See, e.g., Denney*, 2006 WL 1915303, at *10. If no proof of comparable, suitable substitute employment is presented to the trial court, then the trial court has no basis on which to determine the amount by which the plaintiff's damages should be reduced.[7]

In the alternative, SKM and the new owners argue that the language in the noncompetition agreement, in which Maness "acknowledges . . . that he could easily find alternative, commensurate employment or work," relieves them of the burden of proving suitable, comparable substitute employment for the purpose of mitigation of damages. First, this argument was not raised in the trial court, and consequently cannot appropriately be raised for the first time on appeal. *See Coleman Management, Inc. v. Meyer*, 304 S.W.3d 340, 355 (Tenn. Ct. App. 2009). Here, not only was the argument not raised to the trial court, but in this case the trial court expressly declined to consider the noncompetition agreement or Maness's request for declaratory relief that it was unenforceable.[8]

---

[7]Thus, in the absence of supporting evidence, the trial court below clearly erred in holding that Maness's alleged failure to mitigate precluded him from any award of damages at all.

[8]Such circumstances present particular problems where, as here, the noncompetition agreement is likely unenforceable. While it is conceivable that a draconian noncompetition agreement such as the one in this case might be enforceable in a case involving a high-level executive with a global corporation, it is difficult to imagine that a 25-employee manufacturing company could assert a protectable business interest that would justify a noncompetition agreement with a geographic area of the entire United States for a time period of five years. *See generally, Columbus Med. Serv., LLC v. Thomas*, 308 S.W.3d 368 (Tenn. Ct. App. 2009); *Corbin v. Tom Lange Co., Inc.*, No. M2002-01162-COA-R3-CV, 2003 WL 22843167 (Tenn. Ct. App. Dec. 1, 2003).

Moreover, whatever the effect of such a provision in the consideration of whether the noncompetition agreement is enforceable,[9] it does not obviate the need for the employer to submit evidence of suitable, comparable employment to prove the plaintiff's failure to mitigate damages. As noted above, the plaintiff's recovery is only diminished by the amount he would have earned in the exercise of reasonable diligence. A contractual acknowledgement that he could find "alternative, commensurate employment or work" is not equivalent to a stipulation that Maness would have earned compensation that equaled or exceeded the compensation he would have received pursuant to the employment agreement with SKM. Thus, even if the trial court had been presented with this argument, consideration of the language in the noncompete provision would not have enabled the trial court to determine the *amount* by which Maness's damages should be reduced. Therefore, in the absence of evidence that suitable alternative employment was available to Maness, SKM and new owners Collins, Mike Smith, and Josh Smith cannot rely on the affirmative defense of mitigation of damages.

This holding pretermits the issue of whether the issue of mitigation of damages was tried by implied consent.

### CONCLUSION

Accordingly, we affirm the trial court's holding that the termination of Maness's employment was a breach of the employment provisions contained in Article 8 of the parties' asset purchase agreement. We reverse the trial court's holding that Maness's failure to mitigate his damages precludes him from recovering any damages for the breach of his employment contract. The cause must be remanded to the trial court for entry of judgment in favor of Maness and for calculation of Maness's damages resulting from the breach of Article 8 of the asset purchase agreement. The Appellees, having failed to offer proof of suitable alternative employment available to Maness in the proceedings below, are precluded on remand from submitting such proof. Otherwise, the trial court may consider any other matters which the trial court, in its discretion, deems it necessary to consider.

The decision of the trial court is affirmed in part, reversed in part, and remanded, as set forth above. Cost on appeal are to be taxed to Appellees SKM, LLC, Joannie Collins, Mike Smith, and Josh Smith, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[9]We expressly do not address this issue in this appeal.