IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 23, 2021 Session

## NULIFE VENTURES, LLC. v. AVACEN, INC., F/K/A AVACEN MEDICAL, INC.

**Appeal from the Circuit Court for Hamilton County**
**No. 20C673        W. Jeffrey Hollingsworth, Judge**

_____

### No. E2020-01157-COA-R3-CV

_____

The trial court declined to grant injunctive relief to the plaintiff, NuLife Ventures, LLC ("NuLife"), regarding its claims that the defendant, AVACEN, Inc., f/k/a AVACEN Medical, Inc. ("AVACEN"), had been competing with NuLife and soliciting NuLife's affiliated sellers to do the same in violation of the parties' written agreements. NuLife has appealed. Determining that NuLife demonstrated sufficient evidence of a threat of irreparable injury warranting injunctive relief, we reverse the trial court's judgment and remand this matter to the trial court for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

John P. Konvalinka and Cody M. Roebuck, Chattanooga, Tennessee, for the appellant, NuLife Ventures, LLC.

Anthony A. Jackson, Chattanooga, Tennessee, for the appellee, AVACEN, Inc.

### OPINION

#### I. Factual and Procedural Background

On June 22, 2020, NuLife filed a complaint in the Hamilton County Circuit Court ("trial court"), seeking injunctive relief against AVACEN, a manufacturer of medical devices designed to relieve joint and muscle pain ("medical devices"). NuLife is a direct sales company that markets the medical devices, along with other products, through a

network of business owners known as Independent Brand Partners ("IBPs"). NuLife asserted in its complaint that the parties had executed a contract providing that NuLife was to be the exclusive global distributor and reseller of the medical devices ("Reseller Agreement"). NuLife also averred that sale of the medical devices comprised approximately ninety percent of its business.

In its complaint, NuLife explained that it had contracts with each IBP governing each of their respective business relationships. These contracts prohibited the IBPs from, *inter alia*, (1) soliciting or recruiting other IBPs to compete with NuLife or (2) selling medical devices directly from their own websites. NuLife averred that AVACEN was an IBP as well as a manufacturer. According to NuLife, in February 2020, AVACEN began soliciting other IBPs to form a competing direct sales company in order to sell the medical devices, thereby circumventing and entering into competition with NuLife. NuLife claimed that AVACEN also began selling the medical devices directly from its own website.

NuLife further alleged that in May 2020, AVACEN sent a letter to NuLife purportedly terminating the Reseller Agreement upon claiming that NuLife had failed to order the requisite number of medical devices within a certain timeframe pursuant to the contract terms. NuLife stated in its complaint that in actuality, AVACEN had been unable to manufacture a sufficient number of the medical devices to meet NuLife's demand.

NuLife asserted that the Reseller Agreement and the other contracts between the parties were valid and enforceable. Moreover, NuLife asserted that although it had consistently performed its duties pursuant to the applicable contracts, AVACEN had breached the contracts by competing with NuLife in its sale of the medical devices. NuLife claimed that it had been damaged and would be irreparably harmed unless AVACEN was prohibited from continuing such conduct. NuLife sought a temporary restraining order, a temporary injunction, and a permanent injunction "prohibiting AVACEN from competing with NuLife as the exclusive global distributor/reseller" of the medical devices. NuLife also sought an award of attorney's fees and expenses. The trial court issued a temporary restraining order against AVACEN on the same day the complaint was filed and set the matter for hearing on July 2, 2020. The trial court subsequently continued the hearing until July 10, 2020.

On July 7, 2020, AVACEN filed a response in opposition to the temporary restraining order. In its response, AVACEN explained that NuLife was a multi-level marketing company such that its IBPs were compensated pursuant to a structured compensation plan that was based on each individual IBP's sales volume as well as the sales of other IBPs placed beneath it, also referred to as an IBP's "downline." AVACEN averred that the Reseller Agreement required NuLife to purchase 1,500 products cumulatively valued at $1.5 million in the first six months following execution of the

agreement and 4,500 products cumulatively valued at $4.5 million in the following six months, for a total of 6,000 products within the first year. According to AVACEN, it was given an IBP designation by NuLife as part of its consideration for entering into the Reseller Agreement but was not required to execute an IBP contract at that time.

AVACEN alleged that within the first year, it had built a successful downline and was doing well as an IBP, earning the designation of "IBP Director." However, on May 23, 2020, NuLife "unilaterally locked AVACEN out" and forced it to acquiesce in a new IBP contract before AVACEN would be allowed to retrieve essential information regarding its IBP downline and carry on its business. AVACEN alleged that it had no choice but to accept the IBP contract at that time. According to AVACEN, it subsequently provided notice to NuLife that NuLife had materially breached the Reseller Agreement by only purchasing approximately 1,938 products within the first year of the Reseller Agreement. Although AVACEN purportedly provided NuLife forty-five days to cure its breach, NuLife failed to purchase any additional products.

AVACEN averred in its response that on June 15, 2020, AVACEN again contacted NuLife, requesting that it purchase additional medical devices in order to meet its obligations under the Reseller Agreement. AVACEN also informed NuLife that if the medical devices were not purchased by NuLife, AVACEN would release them to other sellers. Because NuLife allegedly failed to purchase further medical devices, AVACEN considered the Reseller Agreement terminated and placed the medical devices for sale on its own website in order to mitigate damages. In summary, AVACEN asserted that NuLife's claims of competition were unfounded and were advanced solely to prevent AVACEN from terminating the Reseller Agreement. AVACEN thus sought dissolution of the temporary restraining order.

Following the July 10, 2020 evidentiary hearing, the trial court entered an order on July 17, 2020, dissolving the temporary restraining order and denying injunctive relief. In pertinent part, the court stated that it had "determined that [NuLife] had not met its burden of demonstrating irreparable injury warranting injunctive relief as required by Tennessee Rule of Civil Procedure 65.04." The trial court concluded that irreparable injury had not been shown "[b]ecause monetary damages can be calculated in this."

AVACEN filed an answer to NuLife's complaint on July 22, 2020, denying that it had breached the parties' contracts and asserting various affirmative defenses. On July 29, 2020, NuLife filed a motion seeking to alter or amend the trial court's order denying injunctive relief. In the alternative, NuLife sought to file an interlocutory appeal. AVACEN filed a response opposing both actions. On August 26, 2020, the trial court entered an order denying NuLife's motion and certifying its order as final pursuant to Tennessee Rule of Civil Procedure 54. NuLife timely appealed.

- 3 -

## II. Issues Presented

NuLife presents the following issues for this Court's review, which we have restated slightly:

1.  Whether the trial court erred by determining that NuLife had failed to establish irreparable harm as required by Tennessee Rule of Civil Procedure 65.04.

2.  Whether the trial court erred by refusing to enforce the written agreements between NuLife and AVACEN.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law, including questions involving contract interpretation, *de novo* with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

This Court reviews a trial court's decision to deny injunctive relief pursuant to an abuse of discretion standard. *See Gentry v. McCain*, 329 S.W.3d 786, 793 (Tenn. Ct. App. 2010). As our Supreme Court has elucidated concerning the abuse of discretion standard of review:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct.

App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524-25 (Tenn. 2010).

## IV. Evidence Concerning Irreparable Injury

NuLife asserts that it presented sufficient evidence that it would suffer an immediate and irreparable injury if it were not granted injunctive relief. The trial court, however, found that NuLife "had not met its burden of demonstrating irreparable injury warranting injunctive relief as required by Tennessee Rule of Civil Procedure 65.04 and that, therefore, the Temporary Restraining Order entered on June 22, 2020, shall be dissolved and that [NuLife's] request for injunctive relief shall be denied." Following our review of the evidence presented, we disagree with the trial court's conclusion.

As this Court has previously explained concerning the burden of proof required for a temporary injunction:

> Under Tenn. R. Civ. P. 65.04(2), the following standards apply with respect to temporary injunctions:
>
> > A temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.
>
> Pursuant to caselaw, there are four factors to be considered by a trial court in deciding whether to issue a temporary injunction: the threat of irreparable harm, the balance between the harm to be prevented and the injury to be inflicted if the injunction issues, the probability that the applicant will succeed on the merits, and the public interest. *Moody v. Hutchison*, 247 S.W.3d 187, 199-200 (Tenn. Ct. App. 2007).

*Curb Records, Inc. v. McGraw*, No. M2011-02762-COA-R3-CV, 2012 WL 4377817, at *3-4 (Tenn. Ct. App. Sept. 25, 2012).

NuLife presented testimony from several witnesses during trial. Christopher Stubbs, NuLife's Chief Operating Officer, testified that the Reseller Agreement provided for NuLife to be the exclusive global distributor and reseller of the medical devices. According to Mr. Stubbs, NuLife's business depended upon maintaining such exclusivity. As Mr. Stubbs explained, "in direct sales or peer-to-peer marketing, reputation and exclusivity are everything. If you lose those two things, you don't have a business."

Mr. Stubbs further testified that as an IBP, AVACEN signed certain agreements stating that it would not recruit NuLife's customers or other IBPs for any other direct sales or network marketing business that competed with NuLife. Mr. Stubbs described this requirement as representing the idea that an IBP could not circumvent NuLife while taking advantage of the network NuLife had built. As Mr. Stubbs explained, peer-to-peer selling was based on trust, and the buyers had to trust the person or company that was selling the products. Mr. Stubbs opined that if trust or credibility were destroyed, buyers would stop purchasing the products from the person or company that had lost credibility.

Mr. Stubbs also articulated that although IBPs were allowed to have their own websites as approved by NuLife, they could not directly sell NuLife's products via their own website, online auction site, or online marketplace. Mr. Stubbs stated that in May 2020, NuLife received information that AVACEN intended to circumvent NuLife and begin selling the medical devices directly. As such, Mr. Stubbs began monitoring the AVACEN website and witnessed the placement of a link or "buy button" on the website allowing consumers to purchase the medical devices directly from AVACEN.

Mr. Stubbs explained that by selling the medical devices directly to consumers, AVACEN tarnished NuLife's reputation because NuLife had represented itself as the exclusive seller of the medical devices. In Mr. Stubbs's opinion, if AVACEN, as the manufacturer of the medical devices, were allowed to begin selling the devices directly to consumers, NuLife would have no purpose and its IBPs would lose faith in NuLife, resulting in a loss of business for both NuLife and its IBPs. According to Mr. Stubbs, AVACEN was offering the medical devices directly to consumers at the same price as NuLife had been charging but with a longer warranty, financing options, and free shipping, all of which would discourage consumers from buying the medical devices from NuLife.

In addition to the "buy button" on AVACEN's website, Mr. Stubbs testified that AVACEN had placed a link for "IBP Support" on its website, which appeared to collect the names and contact information for NuLife's IBPs. Mr. Stubbs stated that NuLife did not authorize this collection of data, which he believed was a violation of the parties' contracts. Mr. Stubbs posited that the network of IBPs was built by NuLife and that if the network were "taken" by another sales company, the harm would be irreparable. Mr. Stubbs also opined that the damages for such action could not be quantified because of the destruction that would be caused to NuLife's business. Mr. Stubbs stated that injunctive relief was necessary to prevent further damage from occurring. According to Mr. Stubbs, NuLife had already suffered damage to its reputation because some of its IBPs had become aware of AVACEN's actions and had made inquiries to NuLife's representatives.

With regard to AVACEN's claims that NuLife had breached the Reseller Agreement by failing to purchase a sufficient number of the medical devices, Mr. Stubbs

explained that from the beginning of their relationship, AVACEN had been unable to produce as many medical devices as NuLife desired to order. Mr. Stubbs acknowledged that part of the reason AVACEN had been unable to increase production was due to issues stemming from the COVID-19 pandemic.

Mr. Stubbs testified that NuLife wished to continue selling the medical devices and desired that AVACEN honor the parties' agreements. He opined that by collecting confidential IBP information, AVACEN would be able to continue NuLife's business model without NuLife, which in turn would destroy NuLife's business and its credibility with its IBPs. According to Mr. Stubbs, he had heard one of AVACEN's owners, Danielle Forsgren, solicit a NuLife IBP to sell medical devices in competition with NuLife by partnering with a new company named AVACEN Medical. Mr. Stubbs also related that he had been told by an AVACEN employee that AVACEN co-owners, Thomas Muehlbauer and Ms. Forsgren, intended to circumvent NuLife and establish AVACEN as a direct seller of the medical devices.

Denis St. Pierre, a NuLife IBP, testified that he had partnered with Bret Matheny to sell NuLife products beginning in August 2019. Mr. St. Pierre related that he had been involved in a recent conversation with Mr. Matheny and Ms. Forsgren wherein Ms. Forsgren informed the IBP partners that AVACEN "wanted to take [its] baby back." According to Mr. St. Pierre, Ms. Forsgren began verbally denigrating NuLife and told the IBP partners that there was "another deal" coming that would be cheaper. However, she remained somewhat cryptic, stating that she could not yet provide details. Mr. St. Pierre related that following that conversation, Mr. Matheny forwarded a text message from Ms. Forsgren requesting that Mr. St. Pierre and Mr. Matheny refrain from telling anyone about the conversation. Mr. St. Pierre and Mr. Matheny were then asked by Ms. Forsgren to sign a non-disclosure agreement before they could receive details regarding the new arrangement, which agreement provided that the parties were "exploring a mutual business relationship." According to Mr. St. Pierre, when Mr. Matheny and he were considering purchasing a "founder's position" in NuLife for $15,000, Ms. Forsgren told them it would be the worst investment they ever made.

Suzanne Bird, who identified herself as NuLife's bookkeeper, corroborated Mr. Stubbs's testimony concerning the "buy button" that had appeared on AVACEN's website. Ms. Bird also testified that she had calculated the number of medical devices ordered by NuLife within the requisite time period and that NuLife had not breached its obligations under the Reseller Agreement. Similarly, Sherri Adams, NuLife's director of compliance, testified that she had also viewed the "buy button" that had appeared on AVACEN's website. Ms. Adams further related that she had listened in on a telephone conversation in March 2020 wherein Ms. Forsgren promoted purchasing the medical devices outside of NuLife. She stated that during the phone call, Ms. Forsgren asked AVACEN employee Stephanie Graham to speak and that Ms. Graham explained how to become an "AVACEN broker" in order to increase one's income and enjoy financial

freedom. Ms. Adams also related that she had noticed certain medical devices offered for sale on the eBay online auction platform and that the sellers were located in the San Diego area, which was where AVACEN was headquartered.

Based on the proof presented, we conclude that NuLife clearly demonstrated that its rights had been "violated by an adverse party and [NuLife] will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual." *See* Tenn. R. Civ. P. 65.04. In the Reseller Agreement, AVACEN granted to NuLife the exclusive right to market and sell the medical devices globally with the specific exceptions of China, Hong Kong, Macao, and Taiwan.[1] AVACEN further agreed to "refrain from selling [the medical devices] over the internet (on-line) or to any other potential reseller that [AVACEN] has reason to believe intends to market and sell such [medical devices] via Direct Selling or online marketing."

NuLife presented proof that AVACEN was violating these contractual provisions by marketing the medical devices directly to consumers via AVACEN's own website within the market that AVACEN had granted to NuLife as exclusive distributor. Mr. Stubbs testified that by doing so, AVACEN would destroy NuLife's business because (1) consumers would be enticed to purchase directly from AVACEN in order to receive longer warranties, financing options, and free shipping, which would decrease the ability of NuLife and its IBPs to sell the medical devices, and (2) consumers and IBPs would lose faith in NuLife because NuLife would be perceived as falsely advertising itself as exclusive distributor of the medical devices, resulting in a diminishment of NuLife's seller reputation.

In addition, the Reseller Agreement provides:

> The Parties acknowledge and agree that they each may come into contact with confidential or proprietary information of the other Party, including but not limited to, vendor or supplier information, terms and conditions of supplier agreements, components or elements of the Services or Documentation, business plans and information, Customer information or data, sales and product plans and data, PII,[2] Usage Data, all information

---

[1] AVACEN argues that the "terms of the Reseller Agreement are not in play" because the temporary restraining order issued by the trial court did not specifically mention the Reseller Agreement. We note, however, that the Reseller Agreement addresses the prohibition against direct and online sales by AVACEN, conduct that was specifically enjoined in the temporary restraining order. We further note that the Reseller Agreement was referenced and relied upon in NuLife's complaint, was made an exhibit at trial, and was the subject of a considerable amount of trial testimony. We therefore find AVACEN's contention in this regard to be unavailing.

[2] "PII" is defined in the agreement as "Personally Identifiable Information, Customer Data, or Affiliate

about NuLife Ventures' network configuration, plant or any equipment attached thereto; and all other information relating to the software, operations, products or service offerings of NuLife Ventures which was disclosed or provided to [AVACEN] or became known to [AVACEN] through its relationship with NuLife Ventures or which a reasonable person knows or should know is confidential ("Confidential Information").

AVACEN expressly agreed to refrain from the "disclosure or unauthorized use" of such information, including "use [of] any of the other Party's Confidential Information for any purpose other than in furtherance of this Agreement." In addition, in NuLife's policies and procedures concerning its IBPs, an IBP is prohibited from "recruit[ing] any [NuLife] Customers or IBPs for any other direct sales or network marketing business[.]" Moreover, in each respective IBP application and agreement, each IBP agreed that it would not "encourage, solicit, or otherwise attempt to recruit or persuade any other Independent Brand Partner to compete with the business of NuLife Ventures."

NuLife presented evidence that AVACEN had attempted to solicit IBP information through its website and that AVACEN had been in contact with certain of NuLife's IBPs regarding a new business venture wherein the IBPs could become "AVACEN brokers." According to Mr. Stubbs, by collecting confidential IBP information and soliciting the IBPs to sell for AVACEN, AVACEN would be able to continue NuLife's business model without NuLife, which would destroy NuLife's business and its credibility with its IBPs.

Considering the language in Tennessee Rule of Civil Procedure 65.04(2) along with the factors listed in *Curb Records*, we determine that NuLife demonstrated sufficient evidence of a threat of irreparable injury warranting injunctive relief. The potential harm to NuLife that could be prevented by a grant of injunctive relief is greater than the potential harm to AVACEN if the injunction issues, and as the trial court recognized, NuLife would likely prevail on a breach of contract claim against AVACEN. *See Curb Records*, 2012 WL 4377817, at *3-4. We further determine that the public interest will be served by enforcing the parties' contracts as written. *See id*.

AVACEN asserts that the trial court was correct in determining that injunctive relief was not warranted because monetary damages could be calculated and would be a sufficient remedy for AVACEN's breach of the parties' agreements. However, as Mr. Stubbs testified, the damage to NuLife's credibility and reputation cannot be easily quantified in terms of money. *See, e.g., Reitz v. City of Mt. Juliet*, No. M2016-02048-COA-R3-CV, 2017 WL 3879201, at *3 (Tenn. Ct. App. Aug. 31, 2017) (explaining that damages for loss of reputation are disfavored in breach of contract actions as

---

Data, other than the personal information that is deemed necessary for shipping and/or warranty related purposes."

nonquantifiable and speculative). We conclude that monetary damages would be insufficient in this matter and, therefore, that the trial court's judgment denying injunctive relief to NuLife should be reversed.

## V. Enforcement of Contracts

NuLife asserts that the trial court erred by refusing to enforce the parties' contracts as written despite implicitly finding the contracts to be enforceable. Both the Reseller Agreement and the IBP contracts specifically provide that certain actions by the parties would constitute irreparable injury. For example, in the Reseller Agreement, the parties agreed that "the disclosure or unauthorized use of Confidential Information may cause irreparable injury and damages may not be readily ascertainable." This agreement further provides that the parties shall "be entitled to seek injunctive relief upon a disclosure or improper use, or threatened disclosure or improper use, of any Confidential Information in addition to such other remedies as may be available at law or in equity."

Similarly, in NuLife's policies and procedures concerning its IBPs, an IBP is prohibited from "recruit[ing] any [NuLife] Customers or IBPs for any other direct sales or network marketing business[.]" Such action is described as "constitut[ing] unreasonable and unwarranted contractual interference between [the IBP] and [NuLife] and would inflict irreparable harm on [NuLife]." NuLife asserts that inasmuch as it proved that AVACEN had undertaken actions in violation of the above contract provisions, irreparable injury was an indisputable conclusion. Having previously determined that NuLife presented sufficient evidence of irreparable injury, however, we determine this issue to be pretermitted as moot.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's judgment denying injunctive relief to NuLife. We remand this matter to the trial court for further proceedings consistent with this opinion. Costs on appeal are assessed to the appellee, AVACEN, Inc.

_____
THOMAS R. FRIERSON, II, JUDGE